Jerome S. Murray and Grace H. Murray v. Commissioner.
Murray v. Comm'r
Docket Nos. 4294-62, 2277-63. United States Tax Court
T.C. Memo 1965-148; 1965 Tax Ct. Memo LEXIS 182; 24 T.C.M. (CCH) 762; T.C.M. (RIA) 65148; May 27, 1965
, Transportation Bldg., Washington, D.C., Joseph A. McMenamin, and L. B. Farr, for the petitioners. Joseph N. Ingolia, for the respondent. KERN Memorandum Findings of Fact and Opinion Respondent determined deficiencies in petitioners' Federal income tax for the years and in the amounts as follows: Year
Deficiency
1957
$401,740.41
1958
141.75
1959
17,337.59
1960
2,573.05
1961
4,468.11
The cases were consolidated for trial, briefing, and opinion. Petitioners dispute the above deficiencies and claim that they overpaid their taxes for the years 1959 and 1961. The principal question involved herein is whether respondent properly determined that petitioner Jerome S. Murray held certain real property or contractual interests therein primarily for sale to customers in the ordinary course of his trade or business so that the gain from the sales of such property or interests constituted ordinary income to him. Specific issues presented for our decision are: (1) Whether the installment collections reported on petitioners' returns in the years 1957 and 1961 representing gain from the sale of an option to purchase land, referred to herein as the Gordon Tract, together with the sale of small *183 contiguous pieces of land and an option covering another piece of such land, constitute ordinary income or long-term capital gain in such years; (2) whether installment collections reported on petitioners' returns for the years 1957 and 1959 representing gain from the sale of an option to purchase land, referred to herein as the Berry Option, constitute ordinary income or long-term capital gain in such years; (3) (a) whether the gain from the sale of real property, referred to herein as the Holmes Bakery property, in 1957 constituted ordinary income or long-term capital gain to petitioners, (b) whether petitioners are entitled to a demolition loss arising from the demolition of the buildings thereon in 1957, (c) whether petitioners are entitled to deduct in that year expenses of such demolition, and (d) the correct depreciated basis of such property in the year of its sale; (4) whether the sale of property in 1957 to Georgetown University resulted in ordinary income or capital gain to petitioners and. alternatively, if the gain thereon represents capital gain to petitioners whether the gain on two of the lots in such transaction represents short-term capital gain and the amount thereof; *184 (5) whether petitioners are entitled to postpone recognition of gain from the sale of properties sold by Murray in 1957 and 1960 under threat of condemnation pursuant to section 1033 of the Internal Revenue Code of 1954, and, if not, whether such gain constitutes long-term capital gain pursuant to section 1231 of the Internal Revenue Code of 1954, as petitioners contend, or ordinary income as determined by respondent; and (6) whether the sales of properties identified in the record as (a) the Kent, Weaver Terrace, and MacArthur Boulevard properties, (b) the "Adams" or "Potomac" property, (c) 1620 Wilson Boulevard, and (d) 301 Broad Street resulted in ordinary income or longterm capital gain to petitioners. The correct amounts of petitioners' self-employment taxes for those years in which they are in issue and their medical expense deductions for the years 1957, 1959, 1960, and 1961 are dependent upon other issues herein and will be determined under Rule 50. At the trial herein petitioners conceded the correctness of respondent's determination that gain in the amount of $6,076.95 in 1958, reported on their return as longterm capital gain, constituted ordinary income. Findings of Fact *185 Some of the facts are stipulated and are hereby found as stipulated. Petitioners are husband and wife, residing in Annapolis, Maryland. They filed joint Federal income tax returns for the years here involved with the district director of internal revenue at Baltimore, Maryland. Petitioner Grace H. Murray is involved herein by virtue of having filed joint returns with her husband. Petitioner Jerome S. Murray will sometimes hereinafter be referred to as Murray or petitioner. Murray's Real Estate Transactions Petitioner entered the real estate business in the early 1930's. His principal activities in that business were in Washington and the adjacent areas of Maryland and Virginia. In the course of that business he has bought and sold real estate, appraised real estate, and has attended between 100 and 200 settlements incident to the purchase or sale of real estate. Around 1940 he began to erect buildings or to remodel existing buildings or real estate for the purpose of creating and collecting rents therefrom. A number of his real estate ventures were carried on jointly with other individuals and at least one, involving the Dupont Circle Building, was carried on for a time through a *186 corporation (later dissolved) in which he and another individual each held approximately half of the stock. Prior to 1940 a part of petitioner's activity in the real estate business was that of a real estate broker. While he ceased to act as a real estate broker in the purchase and sale of real estate he retained his real estate broker's license until 1955 since he was advised that such a license was necessary in order to enable him to collect rents. During the years here in issue Murray was not listed in the telephone directory as a real estate broker, and he belonged to no association in any way connected with the real estate business. He did no subdividing. Other than in 1956 when a bank to which he was indebted required him to reduce his indebtedness, he had no "for sale" signs on any of his properties, and he did not advertise them for sale. In his income tax returns for the years 1949 through 1963 Murray made the following statements concerning his occupation: Year
Occupation
1949
Real Estate
1950
Real Estate
1951
Real Estate
1952
Real Estate
1953
Real Estate
1954
Retail Merchant
1955
Rental Property and
Retail Merchant
1956
No Occupation Given
1957
No Occupation Given
1958
No Occupation Given
1959 *187 No Occupation Given
1960
Investor - Real Estate
1961
Investor - Real Estate
1962
Investments - Real Estate
Rental Properties
1963
Investor
In 1955 Murray stated in deposition that he had been in "the real estate business" since approximately 1930. In 1954 petitioner as sole proprietor began the operation of a retail dry goods business, which he carried on in a building known as the Stewart Building, owned by him at Sixth and D Streets, N.W., Washington, D.C. This business was operated under the style of Stewart's Corner, and was unprofitable, operating at a loss of $14,024.20 during the period July 1 to December 31, 1954, and at a loss of $39,048.92 during the time he operated it in 1955. On or about March 25, 1955, petitioner caused the incorporation of Stewart's Corner, Inc., which will be sometimes referred to hereinafter as Stewart's Corner, with powers not only to operate a retail business but also with broad powers to engage in activities connected with real estate. On or about April 1, 1955, petitioner transferred all of the assets of his sole proprietorship to the corporation in return for all of its stock. One of its officers named Althoff was a son-in-law of petitioner and was a licensed *188 real estate broker. At or about the same time petitioner, on the advice of his accountant, gave up his own license as a real estate broker. Thereafter, Stewart's Corner managed some of petitioner's rental property, acquired and sold interests in certain real estate, and was used as a "straw man" in certain of petitioner's personal real estate transactions. The retail business of Stewart's Corner continued to be unprofitable having operating losses of $73,597.50 in its fiscal year 1956 and $105,000.36 in its fiscal year 1957. At the end of that year it terminated its retail dry goods business. Stewart's Corner acquired in 1955 the following properties with funds advanced to it by Murray plus the execution of mortgage notes or the assumption of existing mortgages: A tract at 1612 K Street, Washington, D.C., acquired for approximately $154,000; a tract at 9th and E Streets, N.W., Washington, D.C., for approximately $133,000, of which Murray advanced approximately $41,000; 731 to 733 4th Street, N.W., Washington, D.C., for approximately $27,600; a tract on 25th Street, N.W., Washington, D.C., acquired for approximately $55,000, of which approximately $42,600 was advanced by Murray; and *189 727-729 4th Street, N.W., Washington, D.C., acquired for approximately $30,000. In 1956 Stewart's Corner acquired the following properties with funds advanced by Murray plus the execution of mortgage notes or the assumption of existing mortgages: 510 2nd Street, N.W., Washington, D.C., for approximately $16,000; 513 3rd Street, N.W., Washington, D.C., for approximately $16,000; approximately 7 acres in Oxon Hill, Maryland, for approximately $40,000; 1731 Moore Street, Rosslyn, Virginia, for approximately $51,000; and a tract in Montgomery County, Maryland, located at the corner of Viers Mill Road and Georgia Avenue, upon which the corporation built in 1958 a gasoline station and leased it to Sinclair for 20 years at a cost of approximately $135,000 for the land and $50,000 for the building. In 1957 Stewart's Corner acquired the following properties with funds advanced by Murray plus the execution of mortgage notes or the assumption of existing mortgages: 127-129 F Street, N.W., Washington, D.C. (part of the Holmes Bakery property which will be referred to again in these Findings), for approximately $155,000; 606-607 6th Street, N.W., Washington, D.C., for approximately $10,000; 615 *190 2nd Street, N.W., Washington, D.C., for approximately $10,000; 400 I Street, N.W., Washington, D.C., for approximately $6,000; 201-205 E Street, N.W., Washington, D.C; 129 F Street, N.W., Washington, D.C., for approximately $8,000 and 501-509 G Street, N.W., Washington, D.C., for approximately $30,000. In 1959 the corporation purchased real estate at 2300 Rhode Island Avenue, Washington, D.C., for $35,293.10. In 1961 the corporation sold to Murray its Sinclair gasoline station in Montgomery County, Maryland, for $231,458.37. Murray purchased the property because it was a good investment, and he still owns it. He paid his corporation the fair market value for the property. Murray directed the operations of Stewart's Corner and made the decisions as to which properties it would purchase and sell. When Murray loaned money to Stewart's Corner, he received no notes in return and Stewart's Corner paid him no interest. Stewart's Corner owed Murray the following amounts as of December 31 in the years indicated: Year
Amount
1955
$209,455.26
1956
250,914.50
1957
263,470.80
1958
265,971.41
1959
223,141.18
1960
207,605.75
Stewart's Corner also obtained loans from banks from time to time not only on the strength *191 of its own financial statement but also, and more importantly, on the personal endorsement of Murray and his wife on notes executed by Stewart's Corner. The books of Stewart's Corner were kept in its own office along with Murray's personal books during the years 1955 and 1956. Subsequent to that time they were kept in Murray's home with Murray's personal books. A clerk hired to keep the books of Stewart's Corner and Murray during the years 1955 through 1958 was paid a salary by Stewart's Corner only. Petitioners' personal income tax returns disclose the following sales of real estate or interests therein made by Murray: Period of
Profit to
Year
Description
Holding
Murray
1941
1121 6th St., N.W.
Not shown
$ 622.80
(deferred profit as
of 12/31/47)
1943
2305 18th St., N.W.
Not shown
10,405.27
(deferred profit as
of 12/31/47)
1944
3 N. Y. Ave., N.W.
Not shown
703.81
(deferred profit as
of 12/31/47)
1945
1244 Franklin St., N.E.
5 mos.
660.78
(deferred profit as
of 12/31/47)
1945
5-7-9 N.Y.Ave., N.W.
11 mos.
4,702.91
(deferred profit as
of 12/31/47)
1945
2408 Nichols Ave., S.E.
3 yrs.
4,083.65
(deferred profit as
of 12/31/47)
1945
2412 Nichols Ave., S.E.
3 yrs., 1 mo.
4,064.97
(deferred profit as
of 12/31/47)
1945
2410 Nichols Ave., S.E. *192 3 yrs., 3 mos.
3,861.19
(deferred profit as
of 12/31/47)
1947
Bethesda Bowling Center
Not shown
13,411.03
(deferred profit as
of 12/31/48)
1949
Chain Bridge Property
4 yrs., 4 mos.
1,997.08
1949
2151 K St., N.W.
5 mos.
3,621.96
1951
38 Penn. Ave., S.E.
8 yrs., 11 mos.
3,057.44
1954
1707-9-11 Eye St., N.W.
1 yr., 5 mos.
64,436.67
1955
1000 Conn. Ave., N.W.
6 mos.
49,309.24
1955
1919-25 M. St., N.W.
8 mos.
24,142.66
1955
1628 K St., N.W.
9 yrs.
46,693.54
1955
Indian Head Heights
1 yr., 8 mos.
41,900.53
1955
Gordon Estate
2 yrs., 4 mos.
1,890,311.98
1956
1719 Eye St., N.W.
2 yrs., 2 mos.
1956
1721 Eye St., N.W.
2 yrs., 7 mos.
61,781.80
1956
1723 Eye St., N.W.
2 yrs., 7 mos.
1956
O'Shea Farm (Maryland)
2 yrs., 6 mos.
59,414.31
1956
1610 K. St., N.W.
10 yrs., 7 mos.
69,619.11
1956
Madison Alley Garage
1 yr., 3 mos.
9,265.02
1957
1105 D St., S.W.
12 yrs., 6 mos.
23,287.09
(Note: Claimed to be sold un-
der threat of condemnation,
see Findings).
1957
404-14 6th St., N.W.
2 yrs.
75,548.33
(Sold at less than fair market
value to Georgetown Uni-
versity and reacquired in a
subsequent year, see Find-
ings).
1957
Holmes Bakery
2 yrs., 4 1/2 mos.
883,417.70
(But see Findings).
1958
Adams Property
3 yrs., 4 mos.
164,088.65
(deferred profit as
of 12/31/58)
1959
1620 Wilson Blvd., Arlington, Va. *193 13 yrs., 1 mo.
17,902.69
1960
301 Broad St., Falls Church, Va.
2 yrs., 3 mos.
19,608.91
1960
38 Myrtle St., N.E.
16 yrs., 1 mo.
2,757.03
1960
College Park Airport (part)
7 yrs., 8 mos.
7,545.94
The property described as "1105 D. St., S.W." was acquired by Murray in 1944. It was later designated as being in an area intended by the District of Columbia Redevelopment Land Agency for an urban renewal or slum clearance project. Condemnation of the property for such project was authorized on December 5, 1956, and it was sold to the Agency pursuant to threat of condemnation in 1957. The property described as "38 Myrtle St., N.E." was sold to the same Agency. The condemnation of such property was authorized in 1959 and it was sold to the Agency pursuant to threat of condemnation in 1960. The property described as "College Park Airport (part)" was sold by Murray pursuant to a threat of condemnation authorized in 1959. A more detailed statement of facts concerning these properties and their ultimate sales is set out infra. The property located at 1919-25 M. St., N.W., was acquired by Murray for the specific purpose of erecting thereon a building to be leased to the Royal Typewriter Co., which was dissatisfied *194 with the premises occupied by it at 1105 D St., S.W., under lease from Murray and referred to hereafter in connection with sales under threat of condemnation. The M Street property was sold by Murray when the Royal Typewriter Co. failed to enter into a contract to lease the proposed building. The proceeds received by Murray from the sale of the O'Shea Farm in 1956, which appears in the above schedule, were paid to the Internal Revenue Service in partial satisfaction of a lien placed on the property in connection with the collection of income taxes owed by Murray. Murray's personal income tax returns and the tax returns of various joint ventures show that the following sales of real estate were made by joint ventures of which Murray was a member: Murray's Profit
Year
Location
(or Loss)
Holding Period
1950
Weaver Terrace (part)
$ 6,535.90
4 yrs.
1951
472 L St., N.W.
23,726.86
6 yrs., 9 mos.
1951
1623-1625 L St., N.W.
41,498.39
6 yrs., 11 mos.
(Shown by Exhibits 187 and
196)
1953
Dupont Circle Building
454,442.25
(Note: Reported by Murray in
See Findings infra.
1954)
1954
3127 12 St., N.E.
3,023.97
Approximately 10 yrs.
1954
1514 L St., N.W.
152,883.89
(Note: Reported by Murray in
2 yrs., 3 mos.
1955)
1955
Weaver Terrace *195 (part)
9,798.09
9 yrs., 2 mos. - 1 part)
9 yrs., 10 mos. - 1 part)
1956
Berry Option
77,000.00
1 yr. (correct period 9 mos.)
(See Findings)
1957
Weaver Terrace (part)
13,050.48
12 yrs., 1 mo.
1957
Kent
2,347.81
11 yrs., 4 mos.
1957
MacArthur Blvd.
16,492.94
11 yrs., 3 mos.
Income tax returns of Stewart's Corner, Inc., disclose the following sales by the corporation of real estate or interests therein: Year
Description
Sales Price
Profit (or Loss)
F.Y. 1956
25th St., N.W.
$ 60,000.00
$ 4,995.00
F.Y. 1956
9th and F Sts., N.W.
177,000.00
37,811.94
F.Y. 1956
605 F St., N.W. (Option)
5,500.00
4,500.00
F.Y. 1957
1612 K St., N.W.
140,000.00
7,626.64
F.Y. 1957
510 2nd St. and 509-513 3rd St., N.W.
101,750.00
26,365.88
F.Y. 1958
615 2nd St., N.W.
16,440.00
6,719.50
F.Y. 1958
301 F. St., N.W.
Not shown
500.00
F.Y. 1958
617 2nd St., N.W.
18,000.00
7,934.44
F.Y. 1958
Rear 127-129 F St., N.W.
27,000.00
11,946.38
F.Y. 1958
129 F. St., N.W.
22,840.00
14,771.07
F.Y. 1960
1731 Moore St., Arlington, Va.
68,000.00
17,587.67
F.Y. 1961
2300 Rhode Island Ave., N.E.
37,000.00
1,633.64
F.Y. 1961
Wheaton Gas Station
231,458.37
50,682.07
The following schedule show the properties owned by Murray as of April 30, 1964, the date each property or part thereof was acquired, and the cost *196 of such acquisitions according to Murray's books: Cost
according
Description
Date
to Murray's
of Property
Acquired
Books
6th and D Streets, N.W.
Sq. 457, Lot 800
400 - 6th St., N.W.
2/ 1/43
$ 76,550.00
Sq. 457, Lot 857
611 D N.W.
6/ 4/47
15,133.35
Sq. 457, Lot 803
612 D N.W.
7/ 8/47
12,130.32
[1] Sq. 457, Lots 843 & 844
408 - 6th St., N.W.
1/27/55
[1] Sq. 457, Lot 856
60,282.50
406 - 6th St., N.W.
1/27/55
Sq. 457, Lot (854-851)
841
412 - 6th St., N.W.
1/ 4/55
25,127.00
Sq. 457, Lot 842
410 - 6th St., N.W.
4/26/55
50,194.00
Sq. 457, Lot 27
8/ 1/55
40,163.50
615 D St., N.W.
Sq. 457, Lot 38
617 D St., N.W.
6/27/55
38,163.50
Sq. 457, Lot (4) C
623 D St., N.W.
6/20/55
50,208.00
Sq. 457, Lot (4) A & B
619 D St., N.W.
6/10/55
$116,864.50
Sq. 457, Lot 840
414 - 6th St., N.W.
9/28/56
53,243.25
Sq. 457, Lot 845
404 - 6th St., N.W.
8/13/56
50,234.50
Sq. 457, Lots 33 & 35
Rear 619-623 D St.,
N.W.
5/ 1/59
95,356.00
46th & Blain Sts., N.E.
Sq. 5137, Lot 36 & 37
8/13/40
600.00
18th & Newton Sts., N.E.
(a) Sq. 4147, L. 39, 46,
47, 48, 49
7/29/52
99,993.80
(b) Sq. 4147, L. 19
3512 - 18th St.,
N.E.
9/10/57
10,097.50
Dixie Airport
Rt. 450 & 301, Md.
6/ 4/52
3,265.01
Parole & West Streets
Annapolis
11/24/53
5,490.20
4130 - 4th St., S.E.
Sq. 6165, L. 58
6/14/52
42,394.09
7200-14 New Hampshire
Takoma *197 Pk., Md.
Bl. 7, Wildwood
Sec. 2, L. 3-P2-p4
7/22/52
71,311.50
Bl. 7, Wildwood
Sec. 2 L 6-P7-P5
8/3/53
30,321.87
Bl. 7, Wildwood
Sec. 2, L.P.4-P.5
7/15/53
50,536.90
College Park Airport
1/6 Prop.
6/ 4/52
13,400.00
5/6 Bought
1/13/54
119,661.00
(This property con-
tained 154 acres.
Approximately 89
acres were sold in
1960).
1112 First St.
Alexandria, Va.
In Holmes Settlement
6/1/55
151,263.00
7th & E Sts., N.W.
Sq. 456, L. 35
7/ 5/55
601,224.50
Sq. 456, L. 809
7/12/55
98,274.00
West St. Extended,
Annapolis
1/ 5/54
14,130.39
Viers Mill & Ga. Ave.
Montgomery Co., Md.
3/30/61
231,458.37
4th St., N.W.
(Bet. G & H)
1962
175,440.00
Jewell Cottage,
Annapolis
Wild Rose Shore, Ann
Arundel Co., Md.
1962
22,500.00
Oxon Hill, Md.
1963
40,246.00
(Originally acquired
by Stewart's Cor-
ner in 1956).
The income tax returns of Stewart's Corner, Inc., disclose that it owned, in addition to the items sold by it as detailed above, the following real estate or interests therein: Cost of
Cost of
Location *198 Land
Building
727-29 4th St., N.W.
$26,634.50
731-33 4th St., N.W.
30,136.25
304 H St., N.W.
23,674.50
Ardmore Farms
25,179.50
101 E St., N.W.
5,358.04
$ 4,242.06
400 Eye St.
3,931.03
2,068.97
201-5 E St., N.W.
44,405.37
45,606.13
501-9 G St., N.W.
15,383.04
14,767.96
Petitioners' income tax returns disclose the receipt of the following gross and net rentals (petitioner Grace Murrary's rentals are designated by (W): Year
Gross Rentals
Net Rentals
1948
$ 59,118.01
$ 15,564.49
27,677.50 (W)
13,044.88 (W)
1949
57,560.47
10,694.46
30,216.64 (W)
17,003.59 (W)
1950
63,645.67
25,484.85
32,875.39 (W)
19,572.14 (W)
1951
68,056.07
24,659.29
32,876.33 (W)
19,260.84 (W)
1952
71,981.41
22,222.37
32,887.51 (W)
19,268.38 (W)
1953
66,915.85
(935.48) Loss
29,937.14 (W)
17,397.71 (W)
1954
83,173.35
(13,744.87) Loss
35,987.83 (W)
22,426.24 (W)
1955
118,346.60
1,782.49
Not shown
7,817.92 (W)
1956
123,892.11
(188,776.14) Loss
2,751.62 (W)
(15,684.98) Loss
(W)
1957
[1] 123,670.89
[1] (123,966.92) Loss
1958
[1] 163,185.79
[1] ( 42,760.75) Loss
1959
[1] 212,353.94
[1] 10,680.33
1960
[1] 209,248.03
[1] ( 18,623.27) Loss
1961
[1] 213,316.32
[1] 11,783.83
1962
207,350.07
1,508.46
1963
[1] 193,829.58
[1] 36,422.83
The income tax returns of Stewart's Corner, Inc., disclose that it received rental *199 income from properties owned by it as follows: Year
Gross Rentals
Net Rentals
F.Y. 1959
$24,459.38
($1,165.21)
F.Y. 1960
26,251.60
( 7,505.73)
F.Y. 1961
27,691.41
( 950.06)
F.Y. 1963
6,257.50
43.33
Petitioners' income tax returns disclose the receipt by them of interest income as follows: 1950
$ 3,345.05
1951
2,398.47
1952
2,179.49
1953
3,724.54
1954
19,583.70
1955
30,275.21
1956
20,225.54
1957
15,435.60
1958
11,390.50
1959
$ 30,270.43
1960
24,711.85
1961
24,712.05
1962
129,767.27
1963
102,175.09
Petitioners' income tax returns disclose deductions on account of demolition expense and losses on abandonment of improvements as follows: Year
Demolition Expenses
Losses on Abandonment
1953
$ 31,810.89
1954
$ 3,718.34
1955
6,808.70
151,950.16
1956
12,848.88
125,553.52
1957
18,299.94 (including
364,337.58 (taken on Holmes
$16,831.09 taken on
Bakery property)
Holmes Bakery property)
1958
3,810.85 (plus $2,190.68
fire loss)
1960
341.36
1962
915.00
190,569.22
1963
8,954.25
27,516.21
In June 1946 Murray acquired stock in Ducirco, Inc., which owned Washington real estate known as the Dupont Circle Building. On April 30, 1952, the corporation was dissolved and its assets were distributed to Murray and J. Daniel Weitzman who owned all of its stock. In Murray's 1952 income *200 tax return he reported net capital gains resulting from such distribution in the amount of $246,725.75. After the distribution in liquidation, Murray and Weitzman owned and operated the property as a joint venture known as Ducirco Company. In 1953 Murray and Weitzman sold the property (including the building, furniture, and equipment) for the net amount of $1,208,884.49, of which $600,000 was represented by notes. In his return for 1954 Murray reported capital gains from this transaction in the amount of $454,442.25, representing one-half of $1,208,884.49 less $150,000 on account of the discounted value placed by Murray on the notes received by the joint venture. Three contiguous properties, known as Weaver Terrace, Kent, and MacArthur Boulevard, were acquired piecemeal by Murray in joint ventures with Weitzman in 1945 and 1946. Prior to 1957 the joint venturers sold two tracts from the property designated as Weaver Terrace, one in 1950 and the other in 1955. Murray's gains from such sales were reported in his returns for those years as long-term capital gains. There was a building of some kind on the MacArthur Boulevard property upon which depreciation was taken until it was demolished *201 in 1954. Rents of $1,440 were received from this property in 1948 and 1949. The net rental income from this property was $582.94 for 1948 and a net loss of $1,115.61 was sustained from this property in 1949. No other income was reported as being received from this property. Other than these rentals from the MacArthur Boulevard property, petitioner received no income from the property held by the joint ventures except the gains of $6,535.90 resulting from the sale in 1950 of a parcel of these properties and of $9,798.09 resulting from the sale in 1955 of another parcel. For all the years during which these properties were held by the joint ventures expenditures for taxes and interest were made by petitioner and Weitzman. In 1957 the remaining properties of these three joint ventures were sold for prices which exceeded the bases of Murray and Weitzman by $63,782.46. In his income tax return for 1957 Murray reported the receipt of $31,891.23 (representing one-half of $63,782.46) as long-term capital gains. On various occasions Murray has used his corporation, Stewart's Corner, and other individuals as straw parties in acquiring real estate. All transactions carried out by Murray in the *202 names of straw parties have been reflected in Murray's books and records. On or about March 14, 1956, the president of the First National Bank called a conference with Murray to induce him to sell some of his real estate holdings in order to reduce his indebtedness to the bank. Murray owed the bank approximately $179,000 at that time. The bank was concerned about Murray's account when it became aware of some outstanding tax liens against Murray's property and of an action brought against Murray by the former owners of Holmes Bakery. On or about August 24, 1956, Murray reduced his indebtedness to the bank in the approximate amount of $83,000. On or about April 23, 1956, Murray obtained a personal loan of $224,000 from the National Mortgage and Investment Corporation in order to pay a judgment obtained against him. Murray and his wife gave a note for the loan secured by a blanket deed of trust on several of Murray's pieces of real estate and on several lots located on Sixth Street, N.W., in Washington, D.C., titles to which were in the name of Stewart's Corner. On April 5, 1956, Murray paid to the district director of internal revenue $116,156.23 in payment of taxes and interest due *203 from Murray for the year 1954, and for release of the lien on his property. For the year 1956 Murray paid income taxes and interest in the approximate amount of $158,000. Respondent's agents examined and audited petitioner's income tax returns for the years 1955, 1956, and 1957, and proposed no material changes in the tax treatment of the gains from the disposition by petitioner of his interests in the Gordon Tract and from the sale of the Berry Option as reported by him in his returns for those years. By a Notice of Adjustment covering the year 1955 (Treasury Department Form 1331) signed on behalf of respondent by the District Director at Baltimore pursuant to a delegation of authority, refund was allowed to petitioner for that year in the amount of $556.43 together with interest thereon. *
During the years here in issue Murray was an investor in real estate (or interests therein) and was also engaged in the business of buying and selling real estate (or interests therein). He held some of his real property as an investment and some of his real property (or interests therein) primarily for sale to customers in *204 the ordinary course of his trade or business as a dealer in real estate. Gordon Tract On December 8, 1952, Murray entered into a contract to purchase approximately 500 acres owned by the Estate of Fulton R. Gordon, located in the Oxon Hill District, Prince Georges County, Maryland. The tract will sometimes hereinafter be referred to as the Gordon Tract and the sellers the Gordon heirs. The total purchase price was $2,000 per acre, or approximately one million dollars. Murray gave a deposit of $30,000 at the time he entered into the contract and he agreed to pay $100,000 cash at the date of conveyance on which the $30,000 deposit was to be credited. The sellers agreed to take back a first deed of trust securing the balance due, which was payable on or before 7 years from the date of settlement, bearing interest at the rate of 3 percent per year. Murray agreed to secure a survey of the property at his own expense. The sellers agreed to pay the real estate broker, Dorothy K. Winston, the commission due to her. The contract provided that 30 acres designated therein and later changed were to be released from "the deferred mortgage" (evidently created by first deed of trust) at the time *205 of settlement. In the contract it was also provided that the remaining acreage should be released from the deferred mortgage at ten cents a square foot as future payments were made. The contract was amended, for the benefit of the Gordon heirs, to provide that the ground was to be "released from the defferred mortgage at Twenty Cents (20") a square foot to a depth of 400 feet for ground fronting on the paved roads surrounding the ground and all other ground to be released at the rate of Ten Cents (10") per square foot." Murray's wife did not sign the contract to purchase the Gordon Tract or the subsequent assignment thereof. Settlement was delayed on the contract of December 8, 1852, because it took approximately 1 year to survey the property and because of several defects in the Gordon heirs' title to the property. A portion of the Gordon Tract (containing approximately 30 acres) which the Gordon heirs proposed to sell to Murray, was owned by William V. James. This tract located within the Gordon Tract will sometimes hereinafter be referred to as the James Tract. Murray was eventually able to clear this defect by purchasing on or about January 26, 1954, from William V. James the property *206 he owned for $55,000 which it was agreed should be credited on the $100,000 payable to the Gordon heirs on the date of conveyance. It was also agreed that the James Tract should be covered by the first deed of trust securing the balance of the purchase price payable to the Gordon heirs. On January 25, 1954, the Gordon heirs delivered a quit claim deed to James who immediately transferred all of his interest in the property to Murray. There were other small parcels within the Gordon Tract to which the Gordon heirs did not have good title. In order to perfect title to the entire tract, Murray acquired these parcels from those claiming title thereto as follows: One parcel (the Gillespie land) was purchased by and conveyed to Murray on or about April 2, 1954. Another parcel (the Gulick land) was purchased by and conveyed to Murray on or about March 24, 1954. Another parcel (the Ford land) was purchased by and conveyed to Murray on or about June 7, 1954. Another parcel (the Clay land) was purchased by and conveyed to Murray on or about April 7, 1954. Another parcel (the Perrygo land) was purchased by and conveyed to Murray on or about May 12, 1953. On May 20, 1954, he also entered into *207 a contract to purchase approximately 3 acres in the so-called Gordon Tract from George M. Berry and Ernest L. Pimm for $8,250. Murray also acquired title to 30 acres contiguous to the Gordon Tract from Indian Head Heights, Inc., a corporation wholly owned by Murray. Dorothy K. Winston advised the Gordon heirs that settlement on the contract would take place on March 17, 1954, although at this time the title of the property had not been cleared. Murray refused to take less than good title to the entire tract. In addition to the objections to the title of the Gordon Tract cleared up by the acquisition by Murray of the parcels detailed above, there were certain Federal tax liens on the property which had not been discharged prior to January 1, 1955. Sometime in 1954 Dorothy K. Winston, a real estate broker, introduced to Murray the Romano brothers who had previously built homes on Long Island, New York. The Romano brothers were owners of a New York corporation known as Mar-Dill Holding Corp., sometimes hereinafter referred to as Mar-Dill. Mar-Dill was interested in acquiring land in the Washington, D.C., area for the construction of a housing development. Dorothy K. Winston showed the *208 owners of Mar-Dill several pieces of property including the Gordon Tract. Mar-Dill was interested, at first, in acquiring only 30 acres with an option to purchase or lease the balance of the land at a sale price of $4,000 per acre. On December 2, 1954, Mar-Dill gave Murray $5,000 as a deposit. In January or February 1955 representatives of Mar-Dill indicated to Murray that they would purchase his * contract to purchase the entire Gordon Tract. In negotiating with the representatives of Mar-Dill, Murray's accountant indicated that he did not want Murray to enter into an executory agreement to sell to Mar-Dill the James Tract and the contracts ** *209 to buy the Gordon Tract and contiguous properties. The owners of Mar-Dill, however, refused to go through with the deal without a signed contract. An impasse was reached and Murray yielded. The agreement between the parties was reduced to writing. Since the principal asset to be acquired by Mar-Dill from Murray was the contract right to purchase the Gordon Tract, it did not require the signature of Murray's wife to the agreement. Mar-Dill and Murray made settlement on this contract on or about March 3, 1955, as of March 5, 1955. Murray assigned to Mar-Dill his contract of December 8, 1952, to purchase the Gordon Tract, upon which contract there was still due a $10,000 cash payment and the obligation of executing a note secured by deed of trust for $886,384.60, together with his real estate contract with Berry upon which there was $7,750 still due. On March 2, 1955, Murray and his wife conveyed to Mar-Dill the several parcels he acquired in clearing up the title to the Gordon Tract, together with approximately 2 acres of the land acquired from Indian Head Heights, Inc. In consideration for all of the foregoing, Mar-Dill agreed to and did pay to Murray $2,095,865.40 as follows: $17,050 by check, $85,200 by note payable in 3 years with 4 percent interest, secured by a deed of trust on land which was released by the Gordon heirs, and $1,993,615.40 by note which bore no interest, secured by a deed of trust covering the property subordinate in certain respects to a deed of trust securing the payment by Mar-Dill of $886,384.60 *210 to the Gordon heirs. Murray's profit on the entire transaction was $1,890,311.98 which he reported on his 1955 return, under the installment method, as long-term capital gain. Mar-Dill purchased the property primarily for the purpose of erecting one-family dwelling houses thereon and also for the purpose of utilizing portions of the property for the erection of commercial buildings. The representatives of Mar-Dill negotiated directly with the Gordon heirs and succeeded in having them agree to include the 30 acres comprising the James Tract in the deed of trust to be given to them in lieu of the 30 acres designated to be released from the mortgage in the contract between the Gordon heirs and Murray. Mar-Dill arranged with the Gordon heirs for a section of the tract to be released from the deed of trust so that it could begin construction of houses on a tract free of any encumbrances. Ultimately, the Gordon heirs arranged for Mar-Dill to take possession of the property. Murray acquired and held the contract to purchase the Gordon Tract and acquired and held the properties contiguous thereto, together with the contract to purchase the Pimm-Berry land, primarily for sale to customers in *211 the regular course of his business as a real estate dealer. The gain on the installment collections received by Murray in 1957 and 1961 from the sale of his contract to purchase the Gordon Tract and from the sale of properties contiguous thereto constituted ordinary income to Murray in such years. Holmes Bakery In the summer of 1954 Murray explored the possibility of purchasing Holmes & Son, Incorporated, a bakery in Washington, D.C., sometimes hereinafter referred to as Holmes Bakery. Murray believed that the bakery business was a "basic" business and therefore had a depression-proof factor. Also, in view of the potential growth in Washington, D.C., Murray believed that the Holmes Bakery had a potential growth. For these reasons he was interested in purchasing the Holmes Bakery to provide a business for his sons to operate. Several conferences were held between Murray as prospective buyer and an officer of Holmes Bakery. During the Labor Day weekend of 1954 Murray's oldest son, who was to have been an active participant in the business, was killed in an automobile accident. Negotiations between Murray and the representatives of Holmes Bakery were then broken off, and were not resumed *212 until approximately January 1955. The negotiations were carried on with the representatives of Holmes Bakery by Murray himself, his accountant, and his attorney. At that time Murray contemplated that the bakery business, if and when acquired, would eventually be operated under the management of his son-in-law, Althoff. On or about January 27, 1955, the negotiations were concluded upon a basis satisfactory to both sides. It was determined that the assets of the Holmes Bakery would be turned over to Murray on May 28, 1955. This date was chosen because it gave Murray and his representatives time in which to become familiar with Holmes' operation, and because May 28, 1955, was a 3-day weekend which made it a convenient time to take an inventory which was part of the process in effecting the change in ownership. At the time Murray negotiated for the purchase of the assets of the Holmes Bakery it was his intention to continue its operation. Holmes Bakery had approximately 400 employees prior to the purchase of its assets by Murray. All of them, including department heads and executives, through the lowest-paid unskilled workers, were assured that the change in ownership did not mean they *213 would lose their jobs. They were informed that Murray intended to enlarge the operation, and therefore the change in ownership was to their advantage. Murray's son-in-law, Althoff, was trained as a replacement for Paul K. Corcoran, the general manager of Holmes Bakery, who had agreed to stay on if necessary as a consultant but only for a limited time. Althoff spent a considerable amount of time, both day and night, at Holmes Bakery, after the negotiations were concluded in January 1955 for the purpose of familiarizing himself with the bakery business. On or about May 2, 1955, Murray advised Corcoran of his conclusion that the operation of Holmes Bakery was too complex for him to become deeply involved in. Murray had made arrangements sometime prior to May 2, 1955, to sell the route business and the personalty of Holmes Bakery to one of its competitors, General Baking Company. Murray's decision not to continue the operation of Holmes Bakery himself was made after he found that the operation of the business required many hours of work, was very complex, and because he did "not want the headache of operating a bakery" - a business which entails work of 160 hours a week. The agreement *214 reached between Murray and Holmes Bakery in January 1955 was given final form by three separate contracts, all dated May 31, 1955. These contracts were executed at the suggestion of the general counsel of Holmes Bakery because of his opinion that it would be to its advantage taxwise, and this suggestion was concurred in by Murray's accountant. One of the reasons why Murray agreed to the execution of the three contracts was that it would facilitate the sale of the operating assets by him to the General Baking Company. One contract covered the bakery operations and called for the transfer to Murray of certain personal property, including the trademarks, goodwill, inventory, rolling stock, and route balances. Murray agreed to pay $360,000 in cash for these assets. Another contract was for the sale of real estate and buildings thereon in Washington, D.C., which comprised the plant of Holmes Bakery, and also real estate and a warehouse thereon in Alexandria, Virginia, which was used by Holmes as a subdepot and loading station. For these items Murray agreed to pay $1,100,000. Payment was to be made by 100 serial promissory notes signed by Murray in the principal amount of $11,000 each. *215 The third contract was a lease agreement covering property known as the Holmes Tract in Rosslyn, Arlington County, Virginia. The term of the lease was 25 years and Murray agreed to pay rent in the amount of $25,000 per year. The lease also provided for an option for Murray to purchase the premises at any time after January 1, 1956. The properties described in the three separate agreements constituted all of the operating assets of Holmes Bakery. At a meeting during the weekend of May 28, 1955, Holmes Bakery transferred to Murray the trademarks, inventory, rolling stock, and route balances in consideration for $360,000 from Murray. At the same meeting Murray conveyed these items to the General Baking Company. Part of the payment given by Murray to Holmes Bakery Company consisted of a check for approximately $207,000 from General Baking Company payable to Murray and endorsed by him to the order of Holmes Bakery. At the same time General Baking Company also gave Murray a check for approximately $100,000. On or about the same date Murray entered into possession of the real estate of Holmes Bakery and leased its bakery building to General Baking Company for the period May 28, 1955, to December *216 31, 1955, for $1,650 a month, with the right in General Baking Company to terminate the lease at the end of any calendar month on 15 days' notice. Murray and the representatives of Holmes Bakery met on June 7, 1955, for the purpose of making final settlement pursuant to the contracts. On that date Murray signed the notes and deeds of trust created in connection with the transaction. However, a dispute arose with regard to the payment of certain money held in escrow by the title company, Murray insisting that certain concessions be made to him pending the clearing of title to a small strip of the Holmes property. In July 1955 Holmes brought an action for specific performance against Murray which resulted in a decree on April 11, 1956, favorable to the plaintiff but modifying the deed of trust to permit Murray to demolish the bakery building. Contiguous to the plant of Holmes Bakery in Washington, D.C., and located on its property were residences occupied by employees who had been with Holmes Bakery for many years. The residences were old and in poor condition in 1955 and were no longer occupied by key personnel. In a discussion involving the future operation of the Holmes Bakery by *217 Murray between Corcoran and Murray it was determined that these residences should be razed to provide additional operating space for the bakery. Corcoran believed this action should have been taken many years prior to 1955, and that the time of change in ownership of Holmes Bakery was an appropriate time to dispossess the tenants in these residences. Accordingly, on or about May 17, 1955, notices were sent to all of such tenants to vacate the premises. Holmes Bakery ceased production on May 27, 1955. On that night the first piece of equipment, a wrapping machine, was moved from Holmes Bakery to the plant of the General Baking Company. The insurance coverage on the Holmes Bakery Building in the total amount of $500,000, in effect when Murray acquired the Holmes Bakery, was maintained by Murray for a period of approximately 1 year after he acquired the property. The bakers' unions in Washington, D.C., to which the baking employees of Holmes and the General Baking Company belonged, required that bakery products sold in Washington, D.C., could not be shipped in from other cities, unless the unions gave their permission. General Baking Company obtained such union permission to bake some *218 of the products at Richmond, Virginia, and Philadelphia, Pennsylvania, previously made by Holmes Bakery in its Washington plant. Therefore, the General Baking Company cancelled its lease after a short period of time. Thereafter, Murray attempted to lease the premises to others. One of the parties whom Murray interested in acquiring the buildings and baking facilities of Holmes Bakery was Ottenberg Bakeries. Ottenberg Bakeries, which operated two separate baking facilities, indicated an interest in consolidating its two operations by using the facilities and buildings available at Holmes Bakery. This plan did not materialize. On July 7, 1956, Murray listed for rent the Holmes Bakery Building with a Washington, D.C., broker. The rental price of the property, consisting of approximately 80,000 square feet, was listed at "80 cents per square foot per year as is." Murray caused drawings to be prepared to convert the bakery building into a warehouse. He obtained, on or about April 16, 1957, a building permit from the District of Columbia to carry out the work called for in such drawing. A structural survey of the building was also made on or about April 15, 1957, to determine the strength *219 of the members in the existing building, and to determine what work was necessary in order to make all parts of the building conform to District of Columbia specifications for warehouses. A revision of the plans was made on April 25, 1957, to provide a loading platform. At that time the negotiations concerning a lease to The Mayer Furniture Co., hereinafter referred to, were in progress. The survey indicated that extensive work would not have to be done to the building. The cost of the work was estimated by the architect to be approximately $3,000. The heating system, including most of the radiators and most of the electrical fixtures, was still in place. Murray paid $800 for the architectural and engineering services rendered and $45 for the building permit. There was a hole in the roof which was made to remove some of the heavy baking equipment in transferring it to the General Baking Company. Murray paid a contractor $1,125 for labor and material to have repairs made to the roof. The work was begun in February 1957. In March 1957 the contractor replaced some joists in the building and replaced some brick and cement. Murray paid $160 for the labor and materials on this job. The same *220 contractor, in May 1957, submitted to Murray an estimate for other construction work on the building in the amount of $3,800. In the early part of 1957 The Mayer Furniture Co. negotiated with Murray for the possible rental of the Holmes Bakery Building to be used as a warehouse. Negotiations extended over a period of several months. On or about April 23, 1957, The Mayer Furniture Co. proposed to lease the premises for 10 years subject to cancellation by it at the end of the third year. Rental was to be $42,000 per year for the first 2 years of the tenancy and $39,500 per year thereafter. The Mayer Furniture Co. required certain construction to be made which was estimated to cost approximately $87,000. No lease to The Mayer Furniture Co. was executed, and negotiations with it were terminated prior to May 23, 1957. On May 23, 1957, Murray offered to lease the Holmes Bakery Building to the General Services Administration with repairs to include acoustical tiled ceiling, asphalt tiled floors, full air conditioning, fluorescent lighting, and all services to be furnished by lessor, for $245,000 per year. If the tenant serviced the building, the rental would be $157,500 per year. This offer *221 to lease was not accepted. Shortly thereafter a real estate broker, acting on behalf of Murray, also attempted unsuccessfully to rent the premises to the Government Printing Office. After Murray failed to succeed in renting the Holmes Bakery Building to another bakery, to the Government, or to The Mayer Furniture Co. he determined it would be best to demolish the building and began the demolition about June 1, 1957, using his own employees. On July 9, 1957, Murray entered into preliminary negotiations with Victor J. Orsinger, sometimes hereinafter referred to as Orsinger, for the sale of the Holmes Bakery premises. The proposed agreement drafted by Orsinger called for the following: "If any additional razing or demolition of structures on the premises is desired and requested by the grantees you [Murray] agree to accomplish same at actual cost." A second letter agreement from Orsinger written on July 16, 1957, which replaced the first letter, indicated that Orsinger was acting on behalf of the Society of the Divine Savior. This letter contained a clause which read: "If requested by the Society or its nominees, the property shall be delivered clear and free from any structures without *222 cost to the Society or its nominees." It also contained the same clause relating to the demolition that appeared in the initial letter of July 9. The letter agreement of July 16 was signed by both Orsinger and Murray. On July 24, 1957, Murray entered into a contract with the ABC Demolition Corporation to complete the demolition and removal of the Holmes Bakery Building and four of the houses in the same square block, all for the price of $18,000. The ABC Demolition Corporation began to work under this contract on July 29, 1957. On July 25, 1957, Orsinger wrote again to Murray concerning the sale of the Holmes Bakery premises. He offered Murray advances to cover the cost of the demolition work which would be deducted from the payments due to Murray. This letter was also signed by Orsinger and Murray. On October 10, 1957, Murray entered into the final contract with Parkwood, Inc., of which Orsinger was the president, to sell to it all the land Murray owned in the square block in which the Holmes Bakery was located. This contract replaced and superseded the letters of July 9 and July 16. When Murray signed the final agreement to sell the land to Parkwood, Inc., the demolition work was *223 not yet completed, and the contract provided that Murray would deliver the property in an "as is" condition except that all structures on the four largest parcels were to be removed by Murray. The October contract also referred to the advances Orsinger made to Murray in connection with the demolition expense. The demolition of the Holmes Bakery premises was not completed until early November. The parties contemplated that Murray would complete the demolition work decided upon and started by Murray prior to his negotiations with Orsinger. Orsinger was only interested in buying the land. In order to dispose of the Holmes Bakery property to Parkwood, Inc., Murray acquired title to or contracted to purchase several lots, in his own name and in the name of Stewart's Corner, within the same square block because Parkwood, Inc., was interested in acquiring an entire city block. These lots were acquired on behalf of and using consideration furnished by Parkwood, Inc., and then conveyed without further consideration to Parkwood, Inc.
Murray did not hold the real estate formerly occupied by Holmes Bakery primarily for sale to customers in the ordinary course of his trade or business. The holmes *224 Bakery property was not acquired with a view to demolition of the bakery buildings thereon situated. The demolition of these buildings was not motivated by the sale of such property to Parkwood, Inc.
[Berry Option] Ralph D. Rocks, sometimes hereinafter referred to as Rocks, was and is the president of a construction company known as the Rocks Enginering Company. He also carried on the business of a real estate broker under the name of Allen & Rocks. Acting individually or through his corporation Rocks had constructed commercial buildings which he rented. He and Murray had had at least one business transaction with each other and were on friendly terms. At some time shortly prior to April 25, 1955, while they were playing handball, Rocks told Murray that he was considering the acquisition of an option to purchase some land near a commercial development of his in Prince Georges County, Maryland. He suggested to Murray that Murray join with him in acquiring the property, subdividing it, and arranging for either Rocks Engineering Company or another building company to improve the lots with low-cost housing and sell them, with Rocks and Murray retaining redeemable ground rents permitted *225 under the laws of Maryland which would be equivalent to approximately 6 percent per annum on the amount at which the ground rents could be redeemed by the purchasers of the improved lots. [1] Murray agreed to join Rocks in the project and to furnish 50 percent of the money required for the acquisition of the property. On or about April 25, 1955, in consideration of $1,000, Rocks obtained a 1-year option to purchase approximately 73 acres in Prince Georges County, Maryland, at a price of $2,533 per acre. The option was renewable for an additional year upon the payment of an additional sum of $2,000. The owners of the property were Heath and Sara Berry and the option to purchase this tract will sometimes hereinafter be referred to as the Berry Option. Murray had a 50 percent interest in the option and he paid 50 percent of the option price. He did not sign the option to purchase the tract because he was not present at the time the option was executed. Murray and Rocks contemplated that after the exercise of the option the land would be subdivided, that approximately 300 houses would be built thereon, that the *226 improved lots would be sold, that prior to such sales the improved lots would be leased to a straw corporation for 99 years renewable forever calling for the annual payment of an amount equal to 6 percent of the valuation of the lots by the sellers, but redeemable after 5 years at a figure representing such valuation capitalized at 6 percent, and that the leases (creating the so-called ground rents) would be assigned to the ultimate purchasers of the improved lots who thereupon had the obligation of paying the ground rents and the privilege of redeeming them. The option agreement provided that houses constructed on that part of the land facing a house located on a tract retained by the Berrys should front toward such tract, that the grantors of the option agreed to join and assist, without expense to them, in subdividing and rezoning the land, and that a purchase money deed of trust to be given to the Berrys by the holder of the option upon its exercise should be subordinated to any first deed of trust secured for construction purposes. Murray and Rocks were unable to go through with their original plans for the land because the Veterans Administration stopped insuring mortgages on *227 houses located on leased land, and a loan secured by a mortgage insured by the Federal Housing Administration, which required the purchaser to pay 10 percent down, was not feasible because the builder would not be able to sell the houses with such a down payment required. Vincent H. Dangler, sometimes hereinafter referred to as Dangler, was a builder of houses on Long Island, New York. He came to Washington at the invitation of the Romano brothers to see their proposed housing development on the Gordon Tract, and became interested in the possible profits to be derived from a housing project in the Washington area. Dangler was led to Rocks' real estate firm by an advertisement in the newspaper, and he was taken to see several tracts of real estate including the land covered by the Berry Option. Thereafter, Dangler and his partner, Siderine, met on several occasions with Murray and Rocks. On January 18, 1956, Dangler and Siderine entered into a contract with Murray and Rocks to pay $155,000 for the Berry Option, to be paid by $5,000 in cash and by the execution of a promissory note in the principal amount of $150,000 payable in 2 years with interest at 6 percent per year, secured by *228 a deed of trust on the property. The note was executed in accordance with the terms of the agreement by a corporation formed by the assignees, known as Pepper Mill Village, Inc. On May 4, 1956, the Berrys conveyed by deed the land under option to Pepper Mill Village, Inc. Although Pepper Mill Village, Inc., was not successful and ultimately went bankrupt, the note for $150,000 was paid at a slight discount to Murray and Rocks by installments in 1956, 1957, and 1959, who divided the proceeds therefrom equally. Murray entered into tentative agreements with Rocks to acquire options on tracts of land adjacent to the Berry Option, but only one of these tracts was acquired by them upon which they intended to eventually build an apartment house to hold for rental income. This property has been rented for several years as a farm. At the time of its sale, Murray held the Berry Option primarily for sale to customers in the ordinary course of his trade or business. The gain on the installment payments received by Murray in 1957 and 1959 constituted ordinary income to him. Georgetown University On or about December 12, 1956, Georgetown University proposed to purchase from Murray the following *229 properties in Washington, D.C., acquired by or for him on the following dates at the following prices: Description of Property
Date of Acquisition
Price
404 Sixth Street, N.W., Lot 845
8/13/56
$ 50,238.35
406 Sixth Street, N.W., Lot 844
1/27/55
60,282.50
408 Sixth Street, N.W., Lot 843
410 Sixth Street, N.W., Lot 842
4/26/55
50,264.68
412 Sixth Street, N.W., Lot 841
1/ 4/55
$ 25,207.23
[1] 414 Sixth Street, N.W., Lot 840
9/28/56
55,521.69
Total
$241,514.45 These prices were approximately the same as the original cost to Murray of these properties as shown by Murray's books. Georgetown University also proposed to pay for the costs of demolishing the buildings on some of the lots at a total cost of $10,559.72, an agent's fee to one Joseph * in the amount of $8,000, and $1,500 representing one-half of certain other costs. Georgetown University was interested in acquiring the land for ultimate use in the expansion of its law center. It was successful in persuading Murray to accept its proposal because of his interest in Georgetown University, and it paid Murray by check the sum of $261,574.17 on or about January 3, 1957, to carry the transaction *230 to completion. The prices which Georgetown University paid for the land were less than the fair market value of the land. In his income tax return for 1957 Murray reported that he had made a charitable gift in that year of $155,450.83, the amount by which the fair market value of this land exceeded the price paid therefor by Georgetown. However, because of statutory percentage limitations (his adjusted gross income as reported for that year was $719.23) he took no deduction on account thereof. Respondent's adjustments resulted in a much larger figure for adjusted gross income in that year, and consequently respondent in his determination of deficiency for that year has allowed a deduction of the charitable gift as reported by petitioner. Stewart's Corner had been used by Murray as a straw man in taking title to and executing a purchase money mortgage on one of the lots conveyed to Georgetown University. Stewart's Corner joined Murray and his wife in executing as grantors the deed by which all of the lots here in question were conveyed to Georgetown. The representatives of *231 Georgetown University dealt only with Murray and not with Stewart's Corner. While the prices received by Murray for these lots were approximately equal to his original costs, they were in excess of his bases as of the time of the sales to Georgetown. The parties agree that the amount of such excess was $75,548.33. [2] The cost to petitioner of lot 840 (known as 414 Sixth Street, N.W.) was $53,243.25. Depreciation taken by him on this property was in the amount of $415.80. His basis in this property at the time of its sale in 1957 was $52,827.45. The cost to petitioner of lot 845 (known as 404 Sixth Street, N.W.) was $50,234.50. Depreciation taken by him on this property was $344.61. His basis in this property at the time of its sale in 1957 was $49,889.89. At the time Murray sold the lots to Georgetown he was promised the opportunity, if the University did not use the lots for educational purposes, to repurchase them at approximately the same prices paid for them by Georgetown. Prior to December 1963 Georgetown decided to locate *232 its law center at another site and in that month sold the lots back to Murray at prices which were approximately equal to Georgetown's bases therein. [3]
Murray's income tax return for 1955 reports the receipt in that year of gross rentals in the amount of $1,782.65 from "406-8-12 6th St." and net rentals therefrom as the loss figure ($1,924.35). His return for 1956 reports the receipt of gross rentals in the amount of $17,991.62 from "6th and D St. N.W." [4] and net rentals therefrom in the amount of $2,739.84. At the time of the sale of 404 through 414 6th Street, N.W., to Georgetown University, all of the Sixth Street properties (except No. 414) were under a 1-year lease commencing *233 October 1, 1956, at an annual rent of $33,000. The lease was renewable for two additional 2-year terms at annual rentals of $36,000 and $37,800, but was terminable by the lessor in case the property was sold to a party who would construct a building thereon. After petitioner reacquired the property from Georgetown in December 1963 he continued to hold it and leased it for a term of 99 years at an annual rent of $100,000 for the first 2 years. The lease contains a provision whereby a minimum annual rent of $180,000 will be in effect beginning in 1966. The lots sold by petitioner to Georgetown University in 1957 did not constitute property held by him primarily for sale to customers in the ordinary course of his business as a dealer in real estate. The gains realized by him from the sale of lots 840 and 845, known as 414 Sixth Street, N.W., and 404 Sixth Street, N.W., in the respective amounts of $2,694.24 and $348.46 constituted short-term capital gains and the gains realized by him from the sale of the other lots constitute long-term capital gains. Involuntary Conversion of Properties The property carried on the books of Murray as "College Park Airport" originally consisted of approximately *234 154 acres located in Maryland not far from Washington, D.C.A. one-sixth interest in this property was owned by a corporation known as College Park Airport Corporation while various individuals owned the remaining five-sixths interest therein. Murray acquired the stock of the Airport Corporation in 1952 and in late 1953 he purchased the interests of the individual owners. Thereafter, the corporation was dissolved. Murray leased the property for use as an airport. The Maryland-National Capital Park and Planning Commission determined at its meeting on November 25, 1959, to initiate condemnation proceedings to acquire a part of this property. On January 20, 1960, the Commission entered into a land purchase contract to purchase approximately 94 acres of the College Park Airport property from Murray and his wife for $90,000, payable in cash. Under the terms of the land purchase contract Murray retained the right to continue the possession of "[all] that portion of the land now used as air field runways * * * until ready to be developed by Vendee, when full possession will be given upon thirty days written notice." By reason of a modification of this contract resulting from a survey made *235 subsequent to its execution, Murray conveyed approximately 89 acres to the Maryland-National Capital Park and Planning Commission in February 1960 for $85,318.68 under threat of condemnation. In 1944 Murray acquired a building at 1105 D Street, S.W., in Washington, D.C., which he leased to the Royal Typewriter Company. This property was located in an area which was later designated by the District of Columbia Redevelopment Land Agency for an urban renewal or slum clearance project. Condemnation of this property for such project was authorized on December 5, 1956. Murray's property at 1105 D Street, S.W., Washington, D.C., was sold under threat of condemnation on March 26, 1957, for $74,600. Murray's property at 38 Myrtle Street, N.E., Washington, D.C., a row brick house acquired by him in 1944 and rented by him as a residence, was sold on May 27, 1960, under threat of condemnation for $5,000 to the District of ColumbiaRedevelopment Land Agency. Authorization for such condemnation was given on September 25, 1959. Murray purchased property at 617 D Street, N.W., on June 27, 1955, for $38,163.50; at 615 D Street, N.W., on July 20, 1955, for $40,163.50; and at 619-22 D Street, N.W., on *236 May 1, 1959, for $95,356. These D Street properties included a store rented as a restaurant and a parking lot. Petitioner took and was allowed deductions on account of the depreciation of all of these properties for the years in which he owned and used them. In February 1960 petitioner made a payment of $49,200 on the mortgage covering the remaining 65 acres of airport property which he then owned (and still owns) and from which he received (and still receives) rental income. Murray's income tax returns for the years 1948 through 1963 indicate the following rentals received from the three properties sold under threat of condemnation. The legends (G) and (N) indicate gross and net rentals, respectively. Figures in parentheses indicate losses. 11th and D Streets,
38 Myrtle Street,
College Park
Year
S.W.
N.E.
Airport
1948
$13,884.65 (G)
$366.00 (G)
7,400.16 (N)
118.97 (N)
1949
11,043.80 (G)
366.00 (G)
3,991.62 (N)
207.27 (N)
1950
11,400.00 (G)
366.00 (G)
5,253.77 (N)
158.82 (N)
1951
12,971.46 (G)
366.00 (G)
6,655.66 (N)
200.77 (N)
1952
12,317.92 (G)
366.00 (G)
5,607.73 (N)
190.53 (N)
1953
12,000.00 (G) [1]
305.00 (G)
6,118.12 (N)
154.48 (N)
1954
10,450.00 (G)
366.00 (G)
$3,250.00 (G)
5,688.11 (N)
230.86 (N)
1,329.43 (N)
1955
11,400.00 *237 (G)
366.00 (G)
3,000.00 (G)
5,362.34 (N)
246.57 (N)
1,886.52 (N)
1956
11,400.00 (G)
152.50 (G)
3,875.00 (G)
5,276.94 (N)
(37.05) (N)
(260.96) (N)
1957
1,900.00 (G) [2]
5,437.50 (G)
2,498.78 (N)
23.42 (N)
1958
6,000.00 (G)
3,366.73 (N)
1959
6,000.00 (G)
(18.27) (N)
1960
5,500.00 (G)
(2,758.90) (N)
1961
6,000.00 (G)
4,381.78 (N)
1962
5,500.00 (G)
6,250.00 (G)
1963
3,809.00 (N)
There is no dispute as to petitioner's basis in the property at 1105 D Street, S.W., sold by him in 1957, or as to his basis in the property at 38 Myrtle Street, N.E., sold by him in 1960. The record herein does not show that respondent erred in the adjustment made by him with regard to the gain realized by petitioner in the sale of the College Park Airport property as reported by him in his 1960 return. These properties were not held by petitioner primarily for sale to customers in the ordinary course of his business as a dealer in real estate *238 and the gains resulting from such sales constituted long-term capital gains. Miscellaneous Transactions in addition to the Kent, Weaver Terrace, and MacArthur Boulevard Properties On March 1, 1946, William D. and Genevieve K. Goodman conveyed property located at 1620 Wilson Boulevard, Arlington, Virginia, to Adele K. Steinman who was a straw man acting on behalf of the petitioner. By deed dated October 17, 1957, Adele K. Steinman conveyed the property to the petitioner for a nominal consideration. Petitioner for a nominal consideration. Petitioner reported the following rents from 1620 Wilson Boulevard in his income tax returns for the years 1948 through 1959, the legends "(G)" and "(N)" denoting gross and net rentals, respectively: 1948
$3,852.41 (G)
2,936.11 (N)
1949
3,656.74 (G)
2,581.48 (N)
1950
3,675.62 (G)
3,241.35 (N)
1951
3,935.50 (G)
2,308.36 (N)
1952
4,000.00 (G)
3,650.05 (N)
1953
2,495.50 (G)
1,400.77 (N)
1954
$2,775.00 (G)
1,542.21 (N)
1955
300.00 (G)
(608.38) (N)
1956
1,950.00 (G)
875.94 (N)
1957
3,291.15 (G)
1,626.43 (N)
1958
4,411.20 (G)
1,836.18 (N)
1959
416.15 (G)
118.07 (N)
The cost of the property to Murray in 1946 was $32,056.61. On February 17, 1959, Murray conveyed the Wilson Boulevard property *239 to Stanley Rakusin and Robert I. Silverman for $50,000. The property known as 1620 Wilson Boulevard was acquired and held by petitioner as an investment and the gain from such sale constitutes long-term capital gain. On June 1, 1958, Murray bought a building located at 301 Broad Street, Falls Church, Virginia, for $278,013.08. In December of that year he made improvements to the property at a cost of $126,685.60. Murray's income tax returns indicate that he rented this property to the Post Office Department. The following is a schedule of the gross (G) and net (N) rentals reported by Murray: 1958
$ 6,509.94 (G)
(9,336.81) (N)
1959
34,704.88 (G)
(5,657.58) (N)
1960
25,776.50 (G)
(4,701.50) (N)
The net losses in rentals received arose from substantial interest expenses and depreciation. On September 6, 1960, petitioner conveyed the 301 Broad Street property to Charles and William, Inc., for $387,918.01. At the time of sale the total depreciation deductions taken on the improvements amounted to $36,889.58. The property known as 301 Broad Street was acquired and held by petitioner as an investment and the gain received upon its sale is taxable as a long-term capital gain. In two separate transactions *240 on February 11 and March 1, 1955, petitioner purchased unimproved property known as the "Adams" or "Potomac" property from Charles C. and Lucille Moore and Boulevard Heights, Incorporated. The cost of this property was $90,265.35. This property was included in a deed of trust securing a note in the amount of $224,000 given by the petitioner to the National Mortgage and Investment Corporation on April 23, 1956. On February 21, 1958, the petitioner conveyed the Adams property to Adams Properties Inc. for $255,000. The profit was reported on the installment basis by the petitioner beginning in 1958. During the period of time that petitioner owned this property he derived no income from it. The property known as the "Adams" or "Potomac" property was held by petitioner for sale in the ordinary course of his trade or business as a dealer in real estate. Consequently, the gain received by petitioner upon its sale is taxable as ordinary income. In 1960 and 1961 petitioner collected $380.71 and $424.30 on an installment sale which he made in 1945. Petitioner reported the taxable portions of said collections, or $357.75 and $398.71, respectively, as long-term capital gain, and respondent has *241 determined that said amounts should be treated in 1960 and 1961 as ordinary income. *
Opinion KERN, Judge: The principal questions presented for our decision are whether the petitioner is entitled to treat as capital gains amounts received by him during the years in issue from the sales of various pieces of real estate or options (or contracts) to buy real estate, or whether, as respondent has determined, all of such gains constitute ordinary income. The dispute between the parties also includes additional questions the two more important of which are (1) whether petitioner properly claimed a deduction for demolition expenses and an abandonment loss relating to the demolition of a bakery building, and (2) whether he reinvested the proceeds of three sales of realty parcels made under threats of condemnation in property under circumstances which justify the nonrecognition of the gain resulting from the sales. The governing statute with respect to the principal question is section 1221 [5] *243 of the Internal Revenue Code of 1954. It provides that the term "capital asset" does not include property held primarily for sale *242 to customers in the ordinary course of a taxpayer's trade or business. Accordingly, it is necessary for us to decide in this proceeding whether each of the pieces of real estate or contractual interests therein, the sales of which gave rise to the taxable income here involved, constitute "property held by the taxpayer primarily for sale to customers in the ordinary course of his trade or business." However, it is obvious that the necessity for making these decisions is dependent upon our resolution of the more basic question which is whether petitioner was engaged in the business of dealing in real estate during the pertinent years in the course of which business properties were held for sale. Petitioner contends that he was not engaged in such a business but was merely an investor. This is not an "either-or" question, i.e., a conclusion that petitioner was an investor in real estate does not preclude a conclusion that he was also (and simultaneously) engaged in the business of dealing in real estate. See Nelson A. Farry, 13 T.C. 8; Walter R. Crabtree, 20 T.C. 841; D. L. Phillips, 24 T.C. 435, 445; and Randolph D. Rouse, 39 T.C. 70, 76. In the instant cases we accept petitioner's contention that he was an investor in real estate but we conclude, contrary to petitioner's contentions, that he was also engaged in the business of dealing in real estate and/or contractual interests therein during the years involved in these proceedings. The question of whether a taxpayer is engaged in the business of dealing in real estate and the subsidiary questions of whether specific sales of property are sales of property primarily held for sale in the ordinary course of that business or constitute liquidations of investments are essentially factual in nature, and each case considering such a question necessarily turns upon its own peculiar facts. D. L. Phillips, supra; Raymond Bauschard, 31 T.C. 910, 915, affd. 279 F. 2d 115. There is no one decisive test by which this question may be determined. Tidewell v. Commissioner, 298 F. 2d 864, affirming a Memorandum Opinion of this Court; Ralph J. Oace, 39 T.C. 743. The courts have developed a number of factors which should be considered. Among these criteria which have evolved are: (1) The purpose for which the property was acquired; (2) the purpose for which the property was held; (3) the improvements and their extent which were made to the property by the taxpayer; (4) the frequency, number, and continuity of the sales; (5) the extent and substantiality of the transactions; (6) the nature and extent of the business of the taxpayer; (7) the extent of advertising to promote sales, or the lack of such advertising; (8) the listing, if any, of the property for sale directly or through brokers. See John D. Riley, 37 T.C. 932, 938, affd. 328 F. 2d 428, and Broughton v. Commissioner, 333 F. 2d 492, affirming a Memorandum Opinion of this Court. No single factor or criterion is entitled to the same weight in each case in which it may appear. C. E. Mauldin, 16 T.C. 698, 709, affd. 195 F. 2d 714; John D. Riley, supra at 938. However, *245 the purpose for which the property was "held" at the time of the sale or exchange is more significant than the purpose for which it was acquired. Ackerman v. United States, 335 F. 2d 521. See also Donald J. Lawrie, 36 T.C. 1117. During the period 1948 through 1963 it is apparent from our Findings that petitioner made numerous sales of real estate and/or contractual interests therein. These sales transactions involved many millions of dollars. Moreover, the gains derived from them constituted the greater part of his income. During the period 1948 through 1963 Murray realized net gains from the sales of real estate and/or contractual interests therein in the total sum of approximately $3,500,000. In addition, he received net gains from sales of real estate held by joint ventures of which he was a member in the total sum of over $800,000. During the same period he received net rental income in the total amount of approximately $70,000, and interest income in the total amount of approximately $410,000. During the taxable years 1957 through 1961 he realized net gains from the sales of real estate and/or contractual interests therein in the total amount of approximately $1,190,000 while *246 the total interest income for those years was approximately $99,400 and his rental income reported in his returns for those years was in the total loss figure of approximately $324,000. Because of the number and continuity of Murray's sales of real estate and/or contractual interests therein, the extent and substantiality of such transactions, the nature and extent of petitioner's business, and our conclusion based on the entire record that many items of such property were acquired and held by him, not for the purpose of obtaining income from them as an investor but for the primary purpose [6] of realizing a profit from their sale as a dealer, we are of the opinion that Murray was in the business of selling real estate and/or contractual interests therein during all of the years here in question. We recognize that some of the factors referred to above, *247 such as the lack of advertising or listing for sale, are favorable to the contention of petitioners on this question. While we are unable to ascribe the weight to them which petitioners urge, under the facts of these cases, we have not ignored them in our resolution of the problem presented. While this conclusion is warranted in our opinion, by a consideration of Murray's real estate activities alone, it is buttressed by a consideration of the activities in this field of Stewart's Corner, a corporation wholly owned and controlled by Murray. [7]
Having reached this conclusion, it becomes necessary for *248 us to examine the several transactions here involved and to determine as to each of them whether the property sold was property held by him primarily for sale to customers in the ordinary course of his business as a dealer in real estate and/or contractual interests therein, or was property held by him not primarily for that purpose but in his role as an investor in real estate. The Gordon Tract Petitioner advances several arguments in connection with his contention that the profit resulting from the sale of his interests in the Gordon Tract should be considered as a long-term capital gain. He first argues that there is no presumption of correctness with regard to respondent's determination of deficiency on this issue since respondent by his examination and acceptance (after making minor adjustments) of petitioner's returns for the prior years in which the profit from this transaction was reported as long-term capital gain has in effect made determinations inconsistent with the determinations of deficiency involved in these proceedings. This argument is without merit. As we said in Municipal Bond Corporation, 41 T.C. 20, 32,reversed and remanded on other grounds, 341 F. 2d 683, "[that] *249 * * * [respondent] accepted without question petitioner's earlier returns in which the payments were treated differently [from respondent's determination in the taxable year] does not in any manner offset the validity of his present determination or afford any basis for estoppel." (Emphasis supplied.) A corollary argument advanced by petitioner appears to be that since respondent by his actions or lack of actions with regard to petitioner's return for 1955 determined that the profit derived from the Gordon Tract transaction was a long-term capital gain in that year and there has been no change in law or fact since that year, the installment payments received by petitioner in the years before us must be considered as long-term capital gains. As we have indicated above, the respondent made no "determination" with regard to petitioner's return for 1955 which would preclude us from considering on its merits the question of whether respondent erred in his determination in the instant cases that petitioner's net receipts from the Gordon Tract transaction constituted ordinary income rather than long-term capital gains, or would in any way affect the validity of the determinations of deficiency *250 here involved. Similar arguments are made by reference in petitioners' brief with regard to the issue having to do with the sale of the Berry Option. In our opinion they are similarly without merit. On the merits petitioner argues that he acquired the contract to purchase the Gordon Tract and intended to use the land covered thereby for the purpose of mining it for sand and gravel, marketing and selling the merchantable timber thereon, and ultimately creating ground rents, and therefore his interests in the Gordon Tract were acquired and held by him as an investor and not as a real estate dealer. The only evidence of such alleged intent and purpose was the unsupported self-serving testimony of Murray himself. It is not corroborated by the circumstances. Murray had never been interested in any way in the sand and gravel or timber businesses and took no actions with regard to the Gordon Tract in 1955 or at any time thereafter, which would indicate an intent to use the Gordon Tract for such purposes. Murray's testimony concerning his intent to create ground rents is vague. There is nothing in the record to indicate that he ever owned ground rents. There is nothing in his testimony as *251 to how he intended to create them. The case of Welsh Homes, Inc., 32 T.C. 239, affd. 279 F. 2d 391, indicates that ground rents are frequently created in Maryland for the purpose of capitalizing (at least temporarily) the profits from the ultimate sales of lots from a real estate development. There is nothing in Murray's testimony to show any other purpose. Accordingly, on the record before us, we are unable to conclude, even if we should accept Murray's testimony on this point, that his avowed intent to create ground rents if and when he exercised his contractual right to purchase the Gordon Tract was inconsistent with his acquisition of the property in the role of a dealer in real estate, or that it was a factor indicating acquisition of his interests in the property in his role as an investor in real estate. The record clearly shows that Murray did not receive and made no attempt to receive any rental income or other income which can be considered as investment income from any of the interests he acquired in the Gordon Tract. The record is equally clear to the effect that he entered into negotiations to sell these interests shortly after their acquisition and did sell them. They *252 included the contractual right to purchase the property owned by the Gordon heirs, a contract * to purchase the Pimm-Berry property, and the title to other properties in the so-called Gordon Tract which had been acquired by him. The ultimate sales made by him to Mar-Dill were of real estate and/or contractual interests therein. As we have already concluded, Murray was in the business of dealing in such property. Accordingly, and in the absence of any convincing proof that such items of property were acquired and held by Murray in his role as an investor, we conclude that they constituted property held by him primarily for sale in the ordinary course of his business, and that the proceeds of the sales thereof constituted ordinary income. In reaching this conclusion we have not failed to consider all of the factors pertinent to this question which we have heretofore mentioned and discussed, including the fact that Murray engaged in no activities promoting the sales. While this is a pertinent factor, it is our opinion that under the facts of these cases it is not controlling *253 and does not outweigh other factors which we consider support and require the conclusion we have reached. The fact that among the items sold to Mar-Dill were the contract to purchase from the Gordon heirs and the contract covering ** the Pimm-Berry land, to the assignments of which the signature of Grace Murray was not required, is, in our opinion, irrelevant. See section 1234, [8] *254 Internal Revenue Code of 1954. Berry Option Most of what we have written with regard to the Gordon Tract transaction is equally applicable to the issue having to do with whether the proceeds from the sale of the so-called Berry Option should be taxed as long-term capital gains or as ordinary income. Petitioner has made much the same arguments with regard to respondent's treatment of his income tax returns for prior years in which a part of these *255 proceeds was reported as capital gains, with regard to his intention to acquire this option as a step toward the creation of ground rents, and with regard to the fact that the property to which this issue relates was an option. For the reasons which we have already stated, we find these arguments to be unconvincing. In connection with petitioner's argument relating to the fact that the property sold was an option we add that in our opinion petitioner's business of dealing in real estate included the dealing in contractual interests therein. This view, it seems to us, is corroborated by the fact that in prior years there were two specific instances shown by the record when Murray acquired and sold such interests, viz., the acquisition and sale of his contract to purchase land from the Gordon heirs and the acquisition and sale of his contract * to purchase the Pimm-Berry land as a part of the Gordon Tract transaction. With regard to this issue we have also concluded, after a consideration of all of the pertinent factors heretofore referred to, that the so-called Berry Option constituted *256 property held by Murray for sale in the ordinary course of his business in the absence of any convincing proof that it was acquired and held by him in his role of an investor. Accordingly, the proceeds of the sale thereof constituted ordinary income. The Holmes Bakery With regard to the issue involving the question of whether the proceeds received by Murray from the sale of the Holmes Bakery property constituted capital gains or ordinary income, we have reached a different result. Our findings establish that petitioner's first plan regarding the Holmes Bakery was to purchase it as a going business for his oldest son to operate. Following his son's death, petitioner temporarily lost interest in acquiring the Holmes Bakery. His interest was subsequently revived, however, and, after negotiations were completed for the purchase of the business, petitioner's son-in-law began to work at the plant. The son-in-law was trained to replace the general manager of the business who could not be prevailed upon to stay on a permanent basis after Murray acquired the business. After approximately 4 months, Murray concluded that the bakery business was too complex for him to operate. He then sold the *257 baking equipment and routes to the General Baking Company and rented the Holmes Bakery Building to that company for a short time. Examinations of the building by architects indicated that the building was in good condition and needed few improvements to meet the District of Columbia specifications for warehouses. He decided to rent it for that or a similar use. Murray carried on negotiations to rent the premises with The Mayer Furniture Company and had an estimate made of the cost of the improvements to the building which that prospective lessee would require. Offers were also made by Murray to lease the premises to the General Services Administration and to the Government Printing Office. Although Murray was unsuccessful in finding a tenant for the premises, there is nothing in the record to indicate that the offers he made and the negotiations he carried on to lease the premises were other than bona fide. Murray began the demolition of the bakery building after he had repeatedly failed to find a suitable tenant for the improved premises and subsequently sold the premises to a purchaser interested only in acquiring the unimproved real estate. On the basis of the record and after due *258 consideration of all the pertinent factors heretofore discussed, we conclude that the Holmes Bakery property was not held by the petitioner primarily for sale to customers in the ordinary course of his trade or business. The Holmes Bakery property was acquired and held by Murray as an investor and constituted a capital asset in his hands. The gain upon the sale was taxable as a long-term capital gain under section 1221 of the Internal Revenue Code of 1954. Nelson A. Farry, supra; Altizer Coal Land Co., 31 T.C. 70; Sproul Realty Co., 38 T.C. 844; Randolph D. Rouse, supra. Respondent also determined that petitioner was not entitled to a loss of $364,337.58 claimed for the year 1957 as a result of the demolition of the Holmes Bakery Building. He also determined that petitioner's claimed deduction of demolition expenses of $17,532.43 with respect to this property is not allowable. Respondent argues that "petitioner purchased the property with the intent to demolish the building, offered the property for sale without the building, and sold the property with the understanding that it be removed." Under these circumstances, he urges that the petitioner is neither entitled to the loss nor *259 the demolition expense deduction. The question is whether the loss claimed by petitioner is properly considered a demolition loss under section 165(a) [9] of the Internal Revenue Code of 1954. The governing regulation is section 1.165-3(a), [10] *260 which provides in part that no demolition loss can be claimed when the taxpayer purchases real property with the intention of either immediately or subsequently demolishing the building situated thereon. We do not think that Murray intended to demolish the Holmes Bakery Building at the time when he acquired the real property here involved. Rather, he first intended to operate a bakery business on the premises and when that proved too difficult he formed an intention to lease it and entered into a leasing arrangement with the General Baking Company. When the General Baking Company terminated its lease, the petitioner made repeated efforts during the latter part of 1955, 1956, and the first part of 1957 to rent the building to the General Services Administration, the Government Printing Office, and other private tenants for use as a warehouse or office building. All of these efforts met with no success. During the first part of 1957 Murray negotiated with representatives of The Mayer Furniture Company who expressed interest in using the Holmes Bakery Building as a warehouse and delivery quarters. However, The Mayer Furniture Company required structural *261 changes which the petitioner estimated were too costly and therefore impractical in view of the expected rent. The negotiations with The Mayer Furniture Company were then terminated. Following a second rejection of a proposed lease by the General Services Administration in May 1957 Murray decided to demolish the building. He began the demolition in late May 1957. The initial demolition work was done by some of his workmen and his son. While the bakery building was in the process of being torn down, Murray began negotiations for sale of the premises with Parkwood, Inc., the ultimate purchaser. He conducted these discussions with Victor J. Orsinger, who acted on behalf of Parkwood, Inc. A preliminary contract of sale was drawn up on July 9, 1957, and an initial letter agreement was signed by Murray and Orsinger on July 16, 1957. The final contract was signed on October 10, 1957. After beginning the demolition work, the petitioner concluded that the task was too great to be performed by his own employees. He then turned to a professional demolition contractor and executed a contract for the demolition of the Holmes Bakery Building on July 24, 1957. The professional wrecking began 5 days *262 later and was completed in early November 1957. Although it was expressly provided in the agreement of sale that the petitioner was to demolish the existing structures on the premises, we find that the demolition occurred independently of the sale of the property. Murray intended to demolish the property and began the demolition almost 2 months prior to his commencement of negotiations with the representative of Parkwood, Inc. Upon this state of the record, we find that the petitioner is entitled to the demolition loss for the Holmes Bakery, and that the cost of this demolition was a properly deductible expense. Cf. Standard Linen Service, Inc., 33 T.C. 1, 18; and Blumenfeld Enterprises, Inc., 23 T.C. 665, affd. 232 F. 2d 396. In view of our findings and conclusions on this issue, it appears that the figure used by petitioners as the basis for the Holmes Bakery property ($463,764.14) is correct. In any event the amount of such basis can be agreed to or determined under Rule 50. Georgetown University Sale In January 1957 petitioners sold certain properties located on the corner of 6th and D Streets, N.W., Washington, D.C., to Georgetown University. Two of these properties, 404 and *263 414 [11] 6th Street, N.W., were acquired by petitioners on August 13, 1956, and September 28, 1956. The four other acquisition dates occurred prior to the above two, and can be found in our Findings, supra. Respondent determined that petitioners realized ordinary income in 1957 in the amount of $75,548.33 [12] upon the sale of all the properties to Georgetown University. He contends that this property was held primarily for sale to customers in the ordinary course of petitioner's trade or business. If we find to the contrary, respondent argues in the alternative that the gain received from the sale of 404 and 414 6th Street, N.W., constituted short-term capital gain in the amount of $25,182.77 because these two parcels were held for less than 6 months and represented one-third of the assemblage sold to Georgetown University. Petitioner urges that *264 the gain from the sale to Georgetown University of all the lots except those known as 404 and 414 6th Street, N.W., constitutes long-term capital gain because the properties were not held primarily for sale in the regular course of any business of petitioner but for investment. With regard to the sale of 404 and 414 6th Street, N.W., he contends that no gain was realized on the sale of these properties and that respondent's alternative allocation of gain is inappropriate because the record contains petitioner's basis in each property and the corresponding amount received upon each sale. The record establishes that all of the Sixth Street properties (except the lot known as 414 6th Street, N.W.) were under a 1-year lease at an annual rent of $33,000 (renewable for two successive 2-year periods at annual rentals of $36,000 and $37,800 but terminable by the lessor on 90 days' notice if the lessor sold the property "for the purpose of construction of a building" thereon) at the time of the sale to Georgetown. Although petitioner demolished the structures located upon 406-8, 410, and 412 Sixth Street, N.W., these properties continued as income-producing investments held by the petitioner *265 until the sale to Georgetown University in January 1957. Once the University ascertained that it could not use this land, the petitioner purchased the property back from Georgetown in December 1963 at approximately the same prices as those for which it was sold. At the time of trial the property continued to be owned by petitioner and was subject to a 99-year lease with an annual rent of $100,000. Moreover, this lease provides for a minimum annual rent of $180,000 beginning in 1966. In view of the above, we do not believe that the Sixth Street properties were held in January 1957 primarily for sale to customers in the ordinary course of petitioner's trade or business. * Although we have held that Murray, in addition to being an investor in real estate, was also engaged in business as a dealer in real estate and/or contractual interests therein, we are of the opinion that the sale to Georgetown University was not a sale by him as a dealer of property held by him primarily for sale in the ordinary course of his business as such a dealer. On the contrary, it is our conclusion that the petitioner acquired and held this property as an investment and sold it to Georgetown at a price far below *266 the fair market value in order to assist the University in acquiring a site for a new law school. Since the repurchase from Georgetown, the petitioner has held all of the Sixth Street properties and received substantial rents therefrom. After due consideration of all of the pertinent factors heretofore discussed and in light of the special circumstances of the sale, coupled with the fact that the property has produced and continues to produce substantial rental income for the petitioner, we conclude that the petitioner acquired and held this property as an investment and that the sale to Georgetown was a capital transaction which should be taxed at capital gains rates. However, since 404 and 414 Sixth Street, N.W., were held for less than 6 months, the gains derived from their sale constitute short-term capital gain. Petitioners are in error in contending that there were no gains realized upon the sale of these two properties. The record shows that their bases in 404 and 414 Sixth Street, N.W., were *267 in the respective amounts of $49,889.89 and $52,827.45. Since the respective prices received for these two properties were $50,238.35 and $55,521.69, the total shortterm capital gain realized by petitioners from this transaction was $3,042.70. The balance of the gain realized by the petitioners from this transaction ($72,505.63) constituted long-term capital gains. Involuntary Conversion The question for our decision with regard to this issue is whether or not the proceeds from the involuntary sales of property owned by the petitioner located at 1105 D Street, S.W., and 38 Myrtle Street, N.E., in the District of Columbia, and the involuntary sale of the property located at the College Park Airport, College Park, Maryland, were used to purchase other property similar or related in service or use to the converted property under circumstances and at times which would make applicable section 1033(a)(3)(A) [13] *269 of the Internal Revenue Code of 1954. Petitioner argues that the three purchases of properties located on D Street, which occurred on June 27 and July 20, 1955, and May 1, 1959, and the payment of the mortgage on the College Park Airport tract were made from the proceeds of these three *268 sales. He contends that these were purchases of "other property" within the meaning of the nonrecognition of gain provisions of section 1033. We have set out in our Findings the facts relating to these properties which concern the dates of the threats or imminences of the condemnation of the properties sold by Murray, the dates of the sales of such properties by him, the amounts realized upon such sales, and the dates of his alleged acquisition of other properties similar or related in service or use to the converted properties. Petitioner urges *270 that the threat or imminence of conversion resulting in his sale of 1105 D Street, S.W., occurred on June 21, 1951, and the threat or imminence of conversion resulting in his sale of property at 38 Myrtle Street, N.E., occurred on October 17, 1957, on which dates large areas in which these properties were located were "designated" by a public agency, referred to in the record as the District of Columbia Redevelopment Land Agency, as sites for urban renewal or slum clearance projects. The only evidentiary basis for this contention is the unsupported testimony of the petitioner which was in effect the opinion of a not disinterested layman as to a conclusion of law. His own witness, an employee of the Land Agency, testified that the authority of the Land Agency to condemn these properties did not come into existence until the respective dates of December 5, 1956, and September 25, 1959. From the testimony of the same witness and exhibits identified by him, it is evident that no one in the employ of the Land Agency notified or purported to notify Murray of any threat or imminence of condemnation of these properties until the respective dates when the authority to condemn them came into *271 existence. Cf. Frank O. Maixner, 33 T.C. 191; Rev. Rul. 63-221, 1963-2 C.B. 332. A witness of petitioner also established that the authority to condemn the airport property did not exist, and that there was no threat or imminence of its condemnation until November 25, 1959. Therefore, the purchases of property on D Street, N.W., made by Murray in 1955 antedated not only the involuntary sales here involved but also the threat or imminence of any condemnation thereof; the purchase of property on D Street, N.W., made by Murray on May 1, 1959, antedated not only the involuntary sales made by Murray in 1960 but also the threat or imminence of any condemnation thereof; and the purchase of the property on D Street, N.W., made by Murray on May 1, 1959, occurred more than 1 year after the close of the first taxable year in which gain was realized by Murray from the sales of property made by him in 1957. Accordingly, section 1033(a)(3)(A), supra, is inapplicable to these transactions by reason of the provisions of section 1033(a)(3)(B). [14] *272 Petitioner further argues that the payment of $49,200 made in February 1960 on the mortgage covering College Park Airport should be considered as a purchase of replacement property within the meaning of section 1033. We do not agree. The discharge of a debt secured by real property does not transfer title to the property from the creditor to the debtor. It merely removes an encumbrance from the property. Therefore, payment of a mortgage is not an acquisition of "other property" within the meaning of section 1033(a)(3)(A). See I.T. 1378, 1922-2 C.B. 26; I.T. 2700, 1933-2 C.B. 73. Because of our holding with regard to petitioner's qualification for the postponement of gain provisions of section 1033, we must now consider whether the gains received from the involuntary conversions constitute long-term capital gains or ordinary income. The relevant provision of the statute is section 1231[15] *274 *275 *276 of the 1954 Code. It provides that gains from the involuntary conversion of "property used in the trade or business" are to be taxed at long-term capital gains rates. The term "property used in the trade or business" is defined in section 1231(b)(1) as property "of a character which is subject to the allowance for depreciation provided in section 167, held for more than 6 months, and real property used in the trade or business, held for more than 6 months, * * *." However, section 1231(b)(1) excludes property properly includable in inventory and property "held by the taxpayer primarily for sale to customers in the ordinary course of his trade or business" from the definition "property used in the trade or business." Since the three properties here involved had been held by petitioner for more than 6 months prior to their involuntary conversions and were subject to allowances for depreciation, the gains resulting from the sales made by petitioner because of threats of condemnation are to be taxed as long-term capital gains unless we should find that they were properties "held by the taxpayer primarily for sale to customers in the ordinary course of his trade or business." Thus the crucial question here is the same as in the issues previously discussed and determined even though arising under a different section of the Internal Revenue Code. Our Findings have set out in detail the rents received from all of these properties before they were sold, and the rent received from the College Park Airport before and after part of that tract was sold. The record indicates that 1105 D Street, S.W., and 38 Myrtle Street, N.E., had been held by petitioner for many years as income-producing investments *277 until the time of their involuntary sales. While the College Park Airport property had been held for a shorter length of time prior to its involuntary sale, the record shows that substantial rentals therefrom had been received by petitioner prior to its sale and that he continued to receive and still receives substantial rentals therefrom since he retained ownership of a part of the tract and the right to use and possession of the part sold subject to a 30-day notice of development by a vendee. After consideration of this question in the light of all the pertinent factors heretofore discussed, we have concluded that these three properties were held by petitioner as investments and were not properties held by him primarily for sale in the ordinary course of his business as a real estate dealer. Accordingly, the gains resulting from the involuntary conversions of the properties are taxable as long-term capital gains. Miscellaneous Transactions Petitioner and one Weitzman operating as joint venturers acquired piecemeal lots in Washington, D.C., which comprised properties referred to in the record as Kent, Weaver Terrace, and MacArthur Boulevard. The first parcels were acquired in 1945 *278 and their acquisitions of property in this locality were completed in 1946. It appears from the record that two of these pieces of real estate were unimproved and that a building located on the other was demolished in 1954. The joint ventures incurred expenses such as taxes and interest in connection with these properties, one-half of which was reflected as deductions in petitioners' individual tax returns. No rental income was derived by petitioner from these properties, except a small amount of rent for a few years (averaging a loss figure) from the building on the MacArthur Boulevard property demolished in 1954. Parts of these properties were sold by petitioner and Weitzman in 1950 and 1955, and the gains therefrom were reported in petitioners' individual tax returns as long-term capital gains. The remainder of the property was sold by petitioner and Weitzman in 1957, and one of the questions presented here is whether the gain from this transaction is taxable as ordinary income or as a long-term capital gain. We have already concluded that petitioner in addition to being an investor in real estate was also engaged in the business of dealing in real estate. The present question therefore *279 is not whether petitioner was engaged in the business of dealing in real estate (a question we have already decided) but whether the particular properties here considered were acquired and held by petitioner as investments or were acquired and held by him as properties held primarily for sale in the ordinary course of his business as a dealer in real estate. On this precise question involving the proper characterization of particular pieces of real estate (or contractual interests therein) as investments or properties held primarily for sale, we have already indicated our view that important factors are the receipt by the taxpayer during the time he holds the property of substantial rentals from the property or the receipt of rentals over a long period of years or the taking of steps which clearly indicate the intention of the taxpayer to use the property for the production of rental income, such as, for example, the making of substantial improvements thereon. The presence of these factors would indicate that the property was acquired and held as an investment. With regard to the three properties here involved, none of these factors is present. We are of the opinion that the evidence *280 herein does not show that respondent erred in his determination that the gain realized by petitioner from the sale of these three properties in 1957 constituted ordinary income. Petitioner, in addition to arguments presented, considered, and rejected with reference to issues already decided by us, argues that the fact that these properties were acquired and held by petitioner and Weitzman as joint venturers is in some way a factor favoring his contention on this issue. We are unable to agree. Petitioner also contends that the 1957 sale was in effect forced on him by Weitzman. The only testimony as to this is the unsupported self-serving testimony of Murray which we are unable to accept at its face. In reaching the conclusion as to this issue, which we have stated above, we have not failed to consider the length of time for which these properties were held or the fact that no active sales campaign was carried on with regard to these properties. We reach the same conclusion with regard to the so-called "Adams" or "Potomac" property. It appears from the small amount of testimony in the record dealing with this property that it was held by Murray for a relatively short period of time *281 before its sale, that no rental income was derived from it, and no steps were taken indicating an intention to derive income from its use. There was nothing unusual about its sale. However, with regard to the properties known as 1620 Wilson Boulevard and 301 Broad Street, we have reached a different conclusion. Murray received substantial rental income from 1620 Wilson Boulevard for approximately 13 years prior to its sale. While Murray held the 301 Broad Street property for a shorter time, he made substantial improvements on it in the year of its acquisition and received substantial rental income from it for several years thereafter. Considering these facts, and all other pertinent factors, we have concluded that the sales of these two properties constituted liquidations of investments rather than sales of property held by Murray primarily for sale in the ordinary course of his business as a dealer in real estate. The amounts of the gains realized by petitioner in these transactions (which we have considered in this Opinion as "Miscellaneous Transactions") are not in dispute. Decisions will be entered under Rule 50. Petitioner has failed to prove that respondent erred in his determination *282 that the taxable portions of receipts in the amounts of $380.71 and $424.30 in 1960 and 1961 from an installment sale made in 1945 constituted ordinary income rather than capital gain. *
Footnotes
1. There is a discrepancy unexplained by the records between the addresses and lot numbers appearing here and those used by Murray and Georgetown University in their conveyances later described herein. This discrepancy, however, appears to be immaterial to any issue herein.↩
1. Includes rentals received by Grace Murray.↩
*. This paragraph was added by official order of the Tax Court, dated 7/1/65.↩
*. By official order of the Tax Court, dated 7/1/65, the word "option" was deleted at this point.↩
**. By official order of the Tax Court, dated 7/1/65, the word "contracts" was substituted for the word "options" at this point.
1. For a description of Maryland ground rents see Welsh Homes, Inc., 32 T.C. 239↩.
1. Title to this lot was held by Stewart's Corner as a "straw man" for Murray.↩
*. By official order of the Tax Court dated 7/1/65, the words "one Joseph" were substituted for the name "Murray."↩
2. It appears from Murray's income tax returns that a large part of this difference is due to depreciation and demolition losses deducted by Murray in 1955 and 1956.↩
3. The deed by which these lots were reconveyed to Murray by Georgetown lists "lot 856" instead of "lot 844." However, it is apparent from the detailed description of "lot 856" that it is the same property as "lot 844." No point is made by the parties with regard to this discrepancy.↩
4. Petitioner's books listed thirteen lots under the general description of "6th and D Streets, N.W." as owned by him in 1956. These included the six lots sold by him to Georgetown University in January 1957 and reacquired by him in 1963.↩
1. Includes rent received from "331 11th Street, S.W." ↩
2. Petitioner's return for 1957 shows deductible expenses as ($598.78) resulting from real estate taxes shown to be ($1,507.68). With no further explanation the figure $598.78 is added to the gross rental income of $1,900, resulting in the net figure of $2,498.78.↩
*. This paragraph was added by official order of the Tax Court, dated 7/1/65.↩
5. SEC. 1221. CAPITAL ASSET DEFINED. For purposes of this subtitle, the term "capital asset" means property held by the taxpayer (whether or not connected with his trade or business), but does not include - (1) stock in trade of the taxpayer or other property of a kind which would properly be included in the inventory of the taxpayer if on hand at the close of the taxable year, or property held by the taxpayer primarily for sale to customers in the ordinary course of his trade or business; * * *↩
6. We reach this conclusion regardless of whether the word "primarily" as used in the statutory phrase "held by the taxpayer primarily" is construed to mean "substantially" or to mean "of first importance" or "principally." See Municipal Bond Corporation, 41 T.C. 20, and the opinion of the Court of Appeals reversing on this point 341 F. 2d 683↩.
7. Petitioners' objections to the testimony adduced in connection with these activities were overruled. Their subsequent motions to strike are hereby denied. As to the relevancy of such testimony, see Broughton v. Commissioner, 333 F. 2d 492, affirming a Memorandum Opinion of this Court; Kaltreider v. Commissioner, 255 F. 2d 833, 838, affirming 28 T.C. 121. As to petitioners' argument under section 7213(a)(1), I.R.C. 1954, see Blair v. Oesterlein Co., 275 U.S. 220, 227. As to their argument based on the alleged inconsistency of respondent, see William Fleming, 3 T.C. 974, affd. 155 F. 2d 204↩.
*. By official order of the Tax Court, dated 7/1/65, the words "a contract" were substituted for the words "an option."↩
**. By official order of the Tax Court, dated 7/1/65, the words "contract covering" were substituted for the words "option on." ↩
8. SEC. 1234. OPTIONS TO BUY OR SELL. (a) Treatment of Gain or Loss. - Gain or loss attributable to the sale or exchange of, or loss attributable to failure to exercise, a privilege or option to buy or sell property shall be considered gain or loss from the sale or exchange of property which has the same character as the property to which the option or privilege relates has in the hands of the taxpayer (or would have in the hands of the taxpayer if acquired by him). (b) Special Rule for Loss Attributable to Failure to Exercise Option. - For purposes of subsection (a), if loss is attributable to failure to exercise a privilege or option, the privilege or option shall be deemed to have been sold or exchanged on the day it expired. (c) Non-Application of Section. - This section shall not apply to - (1) a privilege or option which constitutes property described in paragraph (1) of section 1221; (2) in the case of gain attributable to the sale or exchange of a privilege or option, any income derived in connection with such privilege or option which, without regard to this section, is treated as other than gain from the sale or exchange of a capital asset; (3) a loss attributable to failure to exercise an option described in section 1233(c); or (4) gain attributable to the sale or exchange of a privilege or option acquired by the taxpayer before March 1, 1954, if in the hands of the taxpayer such privilege or option is a capital asset.↩
*. By official order of the Tax Court, dated 7/1/65, the word "contract" was substituted for the word "option."↩
9. SEC. 165. LOSSES. (a) General Rule. - There shall be allowed as a deduction any loss sustained during the taxable year and not compensated for by insurance or otherwise. ↩
10. § 1.165-3 Demolition of buildings. (a) Intent to demolish formed at time of purchase. (1) Except as provided in subparagraph (2) of this paragraph, the following rule shall apply when, in the course of a trade or business or in a transaction entered into for profit, real property is purchased with the intention of demolishing either immediately or subsequently the buildings situated thereon: No deduction shall be allowed under section 165(a) on account of the demolition of the old buildings even though any demolition originally planned is subsequently deferred or abandoned. The entire basis of the property so purchased shall, notwithstanding the provisions of § 1.167(a)-5, be allocated to the land only. Such basis shall be increased by the net cost of demolition or decreased by the net proceeds from demolition. * * *↩
11. 414 6th Street, N.W., was purchased by Murray but title thereto was conveyed to Stewart's Corner as a straw man for Murray. Although Stewart's Corner joined with petitioners in conveying all the lots to Georgetown, the entire gain was properly reported by petitioners in their individual return.↩
12. For an explanation of this gain, see footnote 2, supra.↩
*. By official order of the Tax Court dated June 3, 1965 and signed by Judge Kern, a period was inserted after the word "business" and the first letter of the word "although" was capitalized.↩
13. SEC. 1033. INVOLUNTARY CONVERSIONS. (a) General Rule. - If property (as a result of its destruction in whole or in part, theft, selzure, or requisition or condemnation or threat or imminence thereof) is compulsorily or involuntarily converted - (3) Conversion into money where disposition occurred after 1950. - Into money or into property not similiar or related in service or use to the converted property, and the disposition of the converted property (as defined in paragraph (2)) occurred after December 31, 1950, the gain (if any) shall be recognized except to the extent hereinafter provided in this paragraph: (A) Nonrecognition of gain. - If the taxpayer during the period specified in subparagraph (B), for the purpose of replacing the property so converted, purchases other property similar or related in service or use to the property so converted, or purchases stock in the acquisition of control of a corporation owning such other property, at the election of the taxpayer the gain shall be recognized only to the extent that the amount realized upon such conversion (regardless of whether such amount is received in one or more taxable years) exceeds the cost of such other property or such stock. Such election shall be made at such time and in such manner as the Secretary or his delegate may by regulations prescribe. For purposes of this paragraph - (i) no property or stock acquired before the disposition of the converted property shall be considered to have been acquired for the purpose of replacing such converted property unless held by the taxpayer on the date of such disposition; and (ii) the taxpayer shall be considered to have purchased property or stock only if, but for the provisions of subsection (c) of this section, the unadjusted basis of such property or stock would be its cost within the meaning of section 1012.↩
14. SEC. 1033(a)(3)(B). Period within which property must be replaced. - The period referred to in subparagraph (A) shall be the period beginning with the date of the disposition of the converted property, or the earliest date of the threat or imminence of requisition or condemnation of the converted property, whichever is the earlier, and ending - (i) one year after the close of the first taxable year in which any part of the gain upon the conversion is realized, or (ii) subject to such terms and conditions as may be specified by the Secretary or his delegate, at the close of such later date as the Secretary or his delegate may designate on application by the taxpayer. Such application shall be made at such time and in such manner as the Secretary or his delegate may by regulations prescribe.↩
15. SEC. 1231. PROPERTY USED IN THE TRADE OR BUSINESS AND INVOLUNTARY CONVERSIONS. (a) General Rule. - If, during the taxable year, the recognized gains on sales or exchanges of property used in the trade or business, plus the recognized gains from the compulsory or involuntary conversion (as a result of destruction in whole or in part, theft or seizure, or an exercise of the power of requisition or condenmation or the threat or imminence thereof) of property used in the trade or business and capital assets held for more than 6 months into other property or money, exceed the recognized losses from such sales, exchanges, and conversions, such gains and losses shall be considered as gains and losses from sales or exchanges of capital assets held for more than 6 months. If such gains do not exceed such losses, such gains and losses shall not be considered as gains and losses from sales or exchanges of capital assets. For purposes of this subsection - (1) in determining under this subsection whether gains exceed losses, the gains described therein shall be included only if and to the extent taken into account in computing gross income and the losses described therein shall be included only if and to the extent taken into account in computing taxable income, except that section 1211 shall not apply; and (2) losses upon the destruction, in whole or in part, theft or seizure, or requisition or condemnation of property used in the trade or business or capital assets held for more than 6 months shall be considered losses from a compulsory or involuntary conversion. In the case of any property used in the trade or business and of any capital asset held more than 6 months and held for the production of income, this subsection shall not apply to any loss, in respect of which the taxpayer is not compensated for by insurance in any amount, arising from fire, storm, shipwreck, or other casualty, or from theft. (b) Definition of Property Used in the Trade or Business. - For purposes of this section - (1) General Rule. - The term "property used in the trade or business" means property used in the trade or business, of a character which is subject to the allowance for depreciation provided in section 167, held for more than 6 months, and real property used in the trade or business, held for more than 6 months, which is not - (A) property of a kind which would properly be includible in the inventory of the taxpayer if on hand at the close of the taxable year, (B) property held by the taxpayer primarily for sale to customers in the ordinary course of his trade or business, or (C) a copyright, a literary, musical, or artistic composition, or similar property, held by a taxpayer described in paragraph (3) of section 1221. * * *↩
*. This paragraph was added by official order of the Tax Court dated 7/1/65.↩